# Exhibit 10

# Exhibit 10

FILED
Rebecca Padilla
CLERK, SUPERIOR COURT
12/29/2025  9:18AM
BY: RPERRONE
DEPUTY

Geoffrey M. Trachtenberg, Bar No. 019338
Thomas M. Richardson, Bar No. 018582
Krista T. McCarthy, Bar No. 026969
**FRIEDL RICHARDSON, P.C.**
13633 North Cave Creek Road
Phoenix, Arizona 85022
(602) 553-2220
geoff@friedlrichardson.com
TMRLit@friedlrichardson.com
krista@friedlrichardson.com
*Attorneys for the Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF PINAL

| | |
|---|---|
| **PAULINE DONATTO**, an Arizona citizen; **BRADLEY FOLLETT**, an Arizona citizen; **LINDA GAGNER**, an Arizona citizen; **JON MACERNIE** on behalf of himself and ▮V. G.▮ ▮V. G.▮ an incapacitated minor and an Arizona citizen; **JOHN ("JACK") PODOJIL**, an Arizona citizen; **KRYSTAL STANLEY**, an Arizona citizen; and **TERRY YOSHII**, an Arizona citizen, all on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>vs.<br><br>**GLOBAL WATER–SANTA CRUZ WATER COMPANY, INC.**, an Arizona public service corporation; **GLOBAL WATER RESOURCES, INC.**, a Delaware corporation with its principal place of business in Arizona,<br><br>              Defendants. | Case No. S1100CV202504096<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>*(Other: Declaratory Judgment; Injunctive Relief; Negligence; Public Nuisance; Class Action Claims)*<br><br>*(Tier 3)*<br><br>[Hon. Robert Carter Olson]<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs and the proposed classes, by and through counsel, allege as follows:

***Overview***

1.  This case arises from an acute drinking-water contamination event in the City of Maricopa, where Defendant Global Water – Santa Cruz Water Company, Inc. ("GW-Santa Cruz") operates a public water system serving approximately 84,000 persons.

2.  In late August 2025, Defendant GW-Santa Cruz received a laboratory result showing the presence of *E. coli*—a fecal-indicator organism—in its drinking-water distribution system.

3.  Under Arizona law and fundamental public health principles, detection of *E. coli* in a routine distribution sample constitutes an acute drinking-water emergency ***and*** a potential Maximum Contaminant Level ("MCL") violation because it signals that fecal contamination may have entered the public water supply.

4.  After learning of the *E. coli*-positive result, Defendant GW-Santa Cruz increased chlorine levels and flushed hydrants in the affected area before collecting the required repeat samples.

5.  Those steps can be an appropriate immediate response, but they also can reduce the detectability of fecal bacteria in subsequent culture-based testing—including by shifting organisms into a viable but not culturable state—thereby potentially understating the true extent and duration of contamination.

6.      Even after Defendant GW-Santa Cruz's chlorination and flushing, repeat testing from an adjacent property upstream of the original test point in Defendant GW-Santa Cruz's system *still* showed Total Coliform contamination.

7.      Because the routine sample was *E. coli*-positive, a Total Coliform-positive repeat sample triggered an acute *E. coli* MCL violation.

8.      At that stage, Defendant GW-Santa Cruz had an immediate, urgent, and non-delegable duty under Arizona law and the Revised Total Coliform Rule ("RTCR") to issue a Tier 1 public notice "*as soon as practical*," and in no event later than 24 hours, to warn persons served of the *E. coli* MCL violation and the associated public health risks.

9.      Yet rather than having Tier 1 notice templates and distribution channels ready for rapid deployment—tools that are readily available—Defendant GW-Santa Cruz delayed preparation and distribution of the notice until the last possible minute.

10.     In short, the Tier 1 public notice was not distributed "as soon as practical."

11.     But worse, when Defendant GW-Santa Cruz finally got around to preparing a Tier 1 notice, it crafted a method and form of notice that diminished and obfuscated significant public health information instead of fully informing and warning the public, as required by law and standard public health practices.

12.     Instead, Defendant GW-Santa Cruz repeatedly reassured the public the event was "resolved" based on post-disinfection follow-up testing, without candidly disclosing the limits and context of that testing or other significant facts.

13. Defendant GW-Santa Cruz did not promptly or fully disclose the *E. coli* testing results, the follow-up Total Coliform-positive test results, or prominently communicate the serious public health hazards, risks, and emergent actions that were necessary to protect the public.

14. In practical effect, Defendant GW-Santa Cruz buried key facts, omitted critical information, and issued communications that were delayed, incomplete, and misleading, and that were unnecessarily difficult for customers to access and understand.

15. Three days after first detecting *E. coli*, the company sent a bulk email with a generic and unremarkable subject line, no mention of "*E. coli*" in the text, and an end-of-message hyperlink to a website where key information was diminished, omitted, or buried.

16. According to Defendant GW-Santa Cruz's own delivery metrics, fewer than one in four persons served received that email, and most persons served by the system never received any direct notice.

17. Moreover, that end-of-message hyperlink directed customers to a webpage stating the water was "safe to drink" and the issue "fully resolved," even though Total Coliform-positive results persisted in the affected area and a mandatory formal investigation was not yet begun or complete.

18. Only at the very end of the hyperlinked webpage did the company briefly advise residents to "***discard or boil***" water collected before the email, without explaining

that ice machines, pet bowls, and other equipment could hold contaminated water and continue to expose people to the acute health hazard.

19.     Critically, the Tier 1 public notice obligation runs to the public water system itself—not to the Arizona Department of Environmental Quality ("ADEQ")—and any regulatory oversight does not substitute for Defendant GW-Santa Cruz's independent duty to issue a compliant, timely warning.

20.     As a result of these actions and omissions, many residents in Rancho El Dorado in the City of Maricopa and nearby neighborhoods continued to drink, cook with, and otherwise use water that may have been contaminated with fecal pathogens.

21.     In the days surrounding the contamination event, many residents experienced acute gastrointestinal illness and other symptoms consistent with exposure to fecal contamination in drinking water.

22.     Several Plaintiffs and other residents—many of them medically vulnerable—required medical evaluation or hospitalization and tested positive for a pathogenic *E. coli* infection. Others experienced significant anxiety and loss of trust when they later learned they had been using potentially contaminated water without any meaningful warning.

23.     Plaintiffs bring this class action to hold Defendant GW-Santa Cruz accountable for violating fundamental drinking-water safety and public-notification duties, for concealing and diminishing critical information, and for exposing an entire community to unnecessary risk of serious illness.

24.    In addition to money damages for those harmed, Plaintiffs—who are captive customers without any alternative—seek declaratory and injunctive relief requiring Defendant GW-Santa Cruz to follow existing nondiscretionary drinking-water safety and notice obligations, to provide clear and timely communication during any contamination event, and to protect all current and future customers of the Maricopa water system from similar failures going forward.

### *The Revised Total Coliform Rule*

25.    To protect public health, federal and state law require that potable water distributed or sold to the public be free from poisonous, deleterious, filthy, foreign, or disease-causing substances. *E.g.*, A.R.S. § 36-601(18) (defining public health nuisances).

26.    Modern drinking water regulations have shifted from a "detect-and-penalize" model to an investigative "find-and-fix" framework designed to identify and correct the root cause of sanitary defects.

27.    These requirements are codified in the Revised Total Coliform Rule ("RTCR"), which went into effect on April 1, 2016. The RTCR is a federal regulation promulgated by the Environmental Protection Agency ("EPA"), pursuant to the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j26.

28.    The RTCR requires public water systems ("PWS") to identify and correct conditions that could lead to microbial contamination, with *E. coli* as the primary public health indicator organism.

///

6

***Total Coliforms and E. coli***

29.   The distinction between Total Coliforms and *E. coli* explains why a single positive *E. coli* result carries greater regulatory and public health significance than the detection of other coliform bacteria.

30.   Total Coliforms are a broad group of bacteria found in the environment, including in soil, vegetation, and surface water.

31.   They are used in drinking-water regulation as indicator organisms—their presence signals the water system may be vulnerable to contamination and that conditions may exist allowing disease-causing microorganisms to enter.

32.   Within this group, *E. coli* is a specific subset of coliform bacteria primarily originating in the fecal matter of humans and warm-blooded animals and serves as the definitive indicator of fecal contamination.

33.   *E. coli*'s presence in a drinking-water sample indicates fecal contamination and the possible presence of pathogens capable of causing acute gastrointestinal illness or even potentially fatal illness.

***Arizona Adopted the RTCR***

34.   Under federal law, states may administer their own drinking water programs if they obtain "primacy" from the EPA.

35.   To receive and maintain primacy, a state must adopt regulations no less stringent than the RTCR, enforce those regulations, report data to the EPA, and take enforcement action where violations occur.

36.    States cannot opt out of the RTCR or adopt weaker standards.

37.    Arizona has obtained "primacy" and the Arizona Department of Environmental Quality ("ADEQ") is charged with enforcing the RTCR.

38.    Arizona's Safe Drinking Water Program is administered by ADEQ pursuant to A.R.S. §§ 49-104 and 49-351 *et seq.*, and implementing regulations in A.A.C. Title 18, Chapter 4.

39.    Arizona adopted RTCR federal regulations by "incorporating them by reference." *E.g.*, A.A.C. §§ R18-4-102, R18-4-105, R18-4-119, and R18-4-126(A).

40.    Thus, although this Complaint cites federal regulations, those provisions are binding Arizona law and have been adopted by the State of Arizona.

### *Defendants Global Water Resources Companies*

41.    Defendant GW-Santa Cruz is the regulated public service corporation that owns and operates the PWS in the City of Maricopa and is regulated by the Arizona Corporation Commission.

42.    Defendant Global Water Resources, Inc. ("GWRI") is a Delaware company with its principal place of business in Phoenix, Arizona and is the parent company of Defendant GW-Santa Cruz.

43.    Defendant GWRI is liable for GW-Santa Cruz's conduct under alter-ego and related theories to the extent necessary to prevent injustice and avoid evasion of responsibility.

44.    GWRI's alleged liability is entirely derivative and secondary.

8

***RTCR Key Requirements***

45.     Defendant GW-Santa Cruz's water system is subject to the RTCR and is regulated by ADEQ.

46.     The key requirements of the RTCR relevant to this case include:

> (1) a sample siting plan that details the schedule and specific locations for collecting routine samples;
>
> (2) repeat testing after a routine sample tests positive for Total Coliforms;
>
> (3) public notification within no more than 24 hours of when an acute violation occurs or the presence of *E. coli* cannot be ruled out due to failure to complete the required repeat testing;
>
> (4) an assessment where, after a trigger event—such as a positive routine sample result and retest—a thorough assessment is performed to identify any sanitary defects; and
>
> (5) corrective actions that a PWS must take to address potential contamination pathways identified during the assessment and report their findings to the state.

**A.     *Routine Testing***

47.     Under the RTCR, every PWS must develop and follow a Microbiological Sample Siting Plan ("MSSP") that identifies routine sampling locations and frequency, subject to ADEQ approval. *See* 40 C.F.R. § 141.853(a)–(b).

48.     Routine monitoring must be conducted at the locations and intervals required by the MSSP, based on the population served. *See* 40 C.F.R. §§ 141.854–141.855.

49. Each sample must be analyzed by a certified laboratory for Total Coliforms, and if Total Coliforms are detected, the same sample must be tested for *E. coli*. *See* 40 C.F.R. § 141.852(a)(5).

### B. Repeat Testing and E. coli MCL Violations

50. Once a public PWS obtains a Total Coliform or *E. coli*-positive routine sample result, the RTCR requires repeat sampling, consisting of at least three additional samples, within 24 hours of being notified of the initial positive result.

51. These "repeat samples" must be taken at the original sampling site, as well as at least two locations close by—upstream and downstream. *See* 40 C.F.R. § 141.853(a)(5) (upstream and downstream repeat samples must be within "five service connections" of the original sampling site).

52. The purpose of repeat sampling is to confirm the initial result, determine whether contamination persists, and assess its potential source and scope. *See* 40 C.F.R. § 141.858; A.A.C. § R18-4-126(A); EPA, *RTCR State Implementation Guidance*, § 2.7.2 (June 2020).

53. Subsequent actions required by the RTCR—such as public notice, system assessment, and corrective actions—depend upon the outcome of the repeat sampling.

54. Not every Total Coliform-positive test triggers the same response.

55. The most serious responses are reserved for *E. coli* Maximum Contaminant Level ("MCL") violations.

56.    A single *E. coli*-positive test sample does not, by itself, constitute an *E. coli* MCL violation.

57.    An *E. coli* MCL violation is triggered when:

(1) a repeat sample tests *E. coli*-positive following a Total Coliform-positive routine sample;

(2) a repeat sample tests Total Coliform-positive following an *E. coli*-positive routine sample;

(3) the system fails to collect all required repeat samples after an *E. coli*-positive routine sample; or

(4) the system fails to test a Total Coliform-positive repeat sample *for E. coli*.

*See* 40 C.F.R. § 141.63(c); 40 C.F.R. § 141.860(a); A.A.C. §§ R18-4-102, R18-4-105, and R18-4-126(A).

58.    An *E. coli* MCL violation is a "major violation." *See* EPA, *RTCR: A Quick Reference Guide* (Sept. 2013).

59.    Such a violation is considered an acute risk because it has a "significant potential to have serious adverse effects on human health as a result of short-term exposure." *See* 40 C.F.R. § 141.202(a)(9).

**C.    Public Notification**

60.    If an *E. coli* MCL violation occurs—or if required repeat monitoring is not completed and the presence of *E. coli* cannot be ruled out—the PWS must issue a Tier 1 public notice "***as soon as practical***" (but no later than 24 hours). *See* 40 C.F.R. § 141.202(a)-(b) (emphasis added).

11

61.    A Tier 1 public notice is the ***most urgent*** type of drinking water advisory and is required because *E. coli* represents an acute risk to public health.

62.    The duty on the PWS to notify the public is immediate and is not delayed or suspended by plans for retesting, flushing, or corrective action. *See* 40 C.F.R. § 141.202(a); A.A.C. § R18-4-119.

63.    A Tier 1 public notice must include: the nature of the contamination; source of the contamination (if known); required health effects language; precautionary measures ("boil your water before using," "do not drink the water," "use bottled water"); the population at risk; corrective actions underway; and when safe water is expected to be restored. *See* 40 C.F.R. § 141.205.

64.    The notice must be provided in a manner reasonably calculated to immediately reach "***all persons served***," including residential, commercial, transient, and non-transient users of the PWS. *See* 40 C.F.R. § 141.205.

65.    This typically requires, at a minimum, broadcast media, posting a notice in conspicuous locations throughout the area served, hand delivery to persons served, or another method formally approved by ADEQ. *See* 40 C.F.R. § 141.205.

66.    ADEQ's oversight role does not waive, suspend, or transfer the PWS's Tier 1 notice obligations once an *E. coli* MCL violation (or other Tier 1 condition) exists.

67.    While ADEQ can lawfully approve alternative *methods* of notice delivery, the ***PWS itself*** is ultimately responsible for issuing and delivering a compliant and timely

Tier 1 notice—as soon as practical—following an *E. coli* MCL violation. *See* 40 C.F.R. §§ 141.860(a) and 141.202(a)–(b).

68. The RTCR does not require or anticipate ADEQ pre-approval of Tier 1 notice content as a prerequisite to issuance.

69. ADEQ may provide templates and, as a practical matter, may even informally review drafts of communications from a PWS; but any such review does not waive, delay, or transfer the PWS's non-delegable duty to issue a timely, truthful, complete, and compliant Tier 1 public notice.

70. To the extent ADEQ personnel review drafts, provide templates, or provide informal staff-level feedback, such communications do not constitute a compliance determination, do not certify the notice as adequate or complete, are not an agency adjudication or binding determination of compliance, and do not excuse omissions or delay—the PWS remains exclusively responsible for delivering a compliant notice.

71. That said, ADEQ's "***recommendation from the very <u>first</u> E. coli detection is that [a PWS] do precautionary <u>boil water notices</u>***," and not to delay even while conducting repeat testing. *See* Yoshii, *ADEQ Telephone Conf.* (10/24/25) at 55:40-56:11 (emphasis added).

72. This is because detection of *E. coli* in a PWS represents one of the most serious public health threats recognized under state law.

73. Accordingly, where a Tier 1 public notice is required, Arizona law imposes duties on the PWS to "immediately" issue the public notice.

**D.    Assessments**

74.    If routine and repeat monitoring meets a treatment technique trigger, a PWS must conduct a Level 1 or Level 2 assessment to determine whether a "sanitary defect" exists—*i.e.*, a pathway or condition that could allow microbial contamination to enter the distribution system. *See* 40 C.F.R. § 141.2 and § 141.859(a).

75.    The purpose of an assessment is to identify sanitary defects, determine how and why contamination has entered the system, and evaluate the extent of contamination.

76.    A Level 1 Assessment is triggered when a system exceeds the Total Coliform monitoring triggers specified in 40 C.F.R. § 141.859(a)(1)—for example, multiple Total Coliform–positive routine samples within the same month.

77.    A Level 2 Assessment is more detailed than Level 1 Assessment and must be performed by a qualified individual (someone certified or approved by the state).

78.    A Level 2 Assessment is triggered when: (1) the system incurs an *E. coli* MCL violation; or (2) the system experiences a second Level 1 trigger within a 12-month period. *See* 40 C.F.R. §§ 141.859(a)(2) and 141.860(a).

79.    During an assessment, the PWS must evaluate its source water, treatment processes, storage facilities, distribution system, and operational practices to identify sanitary defects and determine their likely cause. *See* 40 C.F.R. § 141.859(b).

80.    Any sanitary defects discovered must be corrected as soon as possible, and the system must submit the completed assessment form—along with documentation of

corrective actions—to the state within the required timeframes (typically 30 days). *See* 40 C.F.R. § 141.859(b)(3)–(4); § 141.859(c).

### E.    Corrective Actions

81.    An assessment identifies the likely causes of contamination, determines whether sanitary defects exist, and proposes corrective actions.

82.    Repeat testing—especially after hyper-chlorination—is insufficient to demonstrate that sanitary defects have been "resolved." *See, e.g.*, EPA, *RTCR State Implementation Guidance* § 3.1.2 (June 2020) (stating that while additional follow-up sampling may be part of corrective actions, it is not sufficient by itself to address identified sanitary defects).

83.    Likewise, a PWS's decision to remove a sample site from the MSSP is not considered a corrective action under the RTCR. Removing a site from a MSSP merely eliminates a data point and does not correct the underlying sanitary defect.

84.    EPA guidance does not recognize MSSP edits as a corrective action. *See* RTCR State Implementation Guidance (June 2020), § 3.1.2.

### The Contamination Event and Violations of the RTCR

85.    Defendant GW-Santa Cruz reports approximately 29,121 water connections in Pinal County. *See In re Application of Global Water – Santa Cruz Water Company, Inc.*, Docket No. W-20446A-25-0022 (Rate Application) (filed Mar. 5, 2025).

86.    Defendant GW-Santa Cruz reports serving a population of approximately 84,000 people in the relevant water service area. *See* ADEQ, Water Sys. Detail Info. for

GW-Santa Cruz Water System No. AZ0411131, https://azsdwis.azdeq.gov/DWW_EXT/ (last visited Nov. 5, 2025).

87.     This population estimate reflects the fact that each water connection typically serves multiple persons within a household or business (there are approximately 75,000 people domiciled in the City of Maricopa as of 2024).

88.     Based upon this population size, Defendant GW-Santa Cruz is required to collect a minimum of 90 routine distribution-system samples per month. See 40 C.F.R. § 141.857(b) (requiring 90 samples for systems serving between 83,001 and 96,000 people).

89.     On August 26, 2025, according to a Level 2 Assessment Form submitted by Defendant GW-Santa Cruz to ADEQ, an *E. coli*-positive routine distribution sample was collected at a sampling site.

90.     This sample site was ultimately identified as RTCR056.

91.     The Level 2 Assessment indicates that RTCR056 was included in Defendant GW-Santa Cruz's approved MSSP at the time of the positive *E. coli* sample but was subsequently "removed" from the MSSP shortly thereafter.

92.     RTCR056 is—like the overwhelming majority of Defendant GW-Santa Cruz's MSSP sample sites—located at an unsecured private residence.

93.     RTCR056 is located within the Rancho El Dorado subdivision.

94.     On its face, the Level 2 Assessment reflects noncompliance with Arizona drinking-water requirements governing *E. coli* MCL violations and Level 2 assessments, including with respect to the timing, content, and follow-up of the investigation.

95.     The Level 2 Assessment does not disclose the full basis for the Level 2 investigation or the true nature and sequence of the repeat sampling results.

96.     Defendant GW-Santa Cruz's repeat-sampling test results were obtained by Plaintiff Terry Yoshii and, when considered alongside Defendant GW-Santa Cruz's public statements, show that the public was misled regarding the extent, duration, and seriousness of the contamination event.

### A.     *The Contamination Event*

#### 1.  GW-Santa Cruz's Assessment and Conflict of Interest

97.     Defendant GW-Santa Cruz submitted a Level 2 Assessment Form to ADEQ on September 26, 2025—30 days after the positive *E. coli* routine sample.

98.     Defendant GW-Santa Cruz's Level 2 Assessment Form does not explain or disclose on its face why a Level 2 Assessment was legally required.

99.     Under 40 C.F.R. §§ 141.859(a)(2) and 141.860(a), a Level 2 Assessment is mandatory when: (1) a system incurs an *E. coli* MCL violation; or (2) the system experiences a second Level 1 trigger within a 12-month period.

100.    In its submission, Defendant GW-Santa Cruz marked "no" under "Compliance History" when asked whether it had experienced a Level 1 trigger within the prior 12-month period.

101. Given that representation, the only lawful basis for requiring a Level 2 Assessment was that Defendant GW-Santa Cruz incurred an *E. coli* MCL violation based on the August 26, 2025 *E. coli*-positive routine distribution sample.

102. Yet the narrative portion of the Level 2 Assessment does not identify or acknowledge any *E. coli* MCL violation or describe the event as an acute fecal-contamination incident.

103. Defendant GW-Santa Cruz's Level 2 Assessment was executed by Jonathan C. Corwin, a Vice President and General Manager of Defendant GWRI.

104. Mr. Corwin is also the Vice President and "On-Site Manager" of Defendant GW-Santa Cruz. *See* Global Water – Santa Cruz Water Company, Inc., *Annual Report* (dated April 16, 2025).

105. The RTCR does not prohibit a system owner, operator, or affiliated individual from conducting a Level 2 Assessment of its own system, even though such self-assessment presents an inherent conflict of interest when the utility's own conduct is under review.

106. That conflict is especially significant here because, at the same time, Defendant GW-Santa Cruz was seeking approval of a substantial rate increase from the Arizona Corporation Commission. *See In re Application of Global Water – Santa Cruz Water Company, Inc.*, Docket No. W-20446A-25-0022 (Rate Application) (filed Mar. 5, 2025).

18

107. In that Application, Mr. Corwin submitted extensive testimony claiming that Defendant GW-Santa Cruz's operations were safe, compliant, and protective of public health. *See id.*, Direct Testimony of Jonathan Corwin, pp. 579–671 (stating he oversees statewide operations, safety compliance, and regulatory reporting).

**2. GW-Santa Cruz's Unsupported Conclusions in the Assessment**

108. Defendant GW-Santa Cruz's Level 2 Assessment briefly describes the sample site and testing procedure on August 26, 2025, and then speculates—without supporting analysis—that a "major dust storm" in the area may have caused the *E. coli*–positive result.

109. This assessment is scientifically dubious and no meteorological data, historical sampling information, or other documentation was provided to substantiate this "dust storm" theory or to explain how such an event would selectively introduce fecal contamination into the distribution system.

110. The Assessment also states that on August 27, 2025, Defendant GW-Santa Cruz received laboratory notification that "one of thirteen" routine distribution samples was *E. coli*–positive.

111. Although this statement is technically accurate, the Assessment repeatedly refers to "positive samples" while emphasizing that only "one of those [13] samples" was *E. coli*–positive, implying that the event was isolated and minor. That framing omits material facts.

19

112.    In truth, *another* routine sample collected at the same time was Total Coliform–positive and, most significant, an upstream repeat sample of RTCR056 (*i.e.*, within five service connections), was *also* Total Coliform–positive.

113.    These are significant public health indicators under the RTCR and call into question the safety of Defendant GW-Santa Cruz's distribution system.

### 3.    GW-Santa Cruz's Omissions and Misleading Statements in the Assessment

114.    Besides omitting other relevant test results, Defendant GW-Santa Cruz repeatedly represented to the public, ADEQ, and the City of Maricopa that "only one of thirteen samples" collected in late August 2025 had tested positive for *E. coli*. This framing was misleading.

115.    The "one of 13 routine samples" statistic suggests that the contamination was confined to a small, isolated portion of the system—approximately 7.7%—when, in fact, the thirteen samples represented only a small subset of the system's total routine monitoring sites.

116.    Defendant GW-Santa Cruz's ADEQ-approved MSSP identifies a total of ninety-five (95) routine monitoring sites throughout the Maricopa distribution system.

117.    Yet, during the relevant period in this case, only thirteen (13) of those ninety-five (95) sites—roughly 14%—were tested.

118.    The thirteen routine sample sites tested by Defendant GW-Santa Cruz on August 26, 2025 were not geographically diverse; they fell mostly along a narrow residential corridor.

119.  Using Defendant GW-Santa Cruz's logic, the remaining eighty-two (82) routine sites—about 86% of the system's routine monitoring locations—were of unknown microbiological quality.

120.  Compounding the misrepresentation, Defendant GW-Santa Cruz's records confirm that the *E. coli*–positive site (RTCR056) had ***not*** previously been tested at any point earlier in August 2025, meaning contamination could have persisted undetected for days or weeks before the August 26 sample.

121.  While no one expects Defendant GW-Santa Cruz to immediately test all ninety-five MSSP sites, by omitting other relevant test results and emphasizing that only "one of those [13] samples" was *E. coli*-positive, Defendant GW-Santa Cruz created the false impression that its water system was overwhelmingly safe when, in reality, the true extent of contamination was ***unknown*** for the vast majority of customers.

122.  Given the limited number and poor geographic spread of routine sites within this portion of the system, a single *E. coli*–positive result and several coliform-negative samples do not rule out broader contamination.

123.  At best, they show that the monitoring program had low sensitivity for detecting a short-lived or spatially patchy contamination event.

124.  Rather than treat RTCR056 as a "canary in the coal mine"—*i.e.*, a sentinel indicator of a potential sanitary defect within the distribution system—Defendant GW-Santa Cruz treated it as an isolated anomaly and confined its investigation to a narrow

corridor of routine testing sites, thereby failing to identify and correct the underlying distribution-system problem.

125. As detailed further below, Defendant GW-Santa Cruz also increased chlorine levels and flushed portions of the system before completing repeat sampling and its Level 2 investigation—actions that, while often used as immediate corrective measures, tend to reduce the ability of follow-up testing to detect ongoing fecal contamination and to define the true scope, source, and duration of the contamination.

### 4. GW-Santa Cruz's Misleading "Affected Area Map"

126. After the August 2025 contamination event, Defendant GW-Santa Cruz prepared and distributed a color map purporting to show the "affected area" within the City of Maricopa.

127. Defendant GW-Santa Cruz sought to limit the "Affected Area Map" in furtherance of its desire to diminish the seriousness of the contamination event.

128. On that map, Defendant GW-Santa Cruz drew a red outline around certain neighborhoods and represented that the contamination event was limited to that area (the "Affected Area Map"). Attached hereto and incorporated herein as **Exhibit A** is a true and correct copy of the Affected Area Map distributed by Defendant GW-Santa Cruz.

129. The Affected Area Map gave a misleading impression of the incident's scope for several reasons.

130. First, Defendant GW-Santa Cruz's own sampling records show that nearly half of the routine samples collected in the days immediately preceding the August 26,

22

2025 *E. coli* detection were taken **outside** the red-outlined "affected area," and that all but one of the August 25 samples were **outside** that red-outlined area.

131.    Second, the thirteen (13) routine samples collected on August 26, 2025 were not randomly or evenly spread among the red-outlined "affected area," but instead fell largely along a **narrow** north–south corridor of the system. And, as discussed further below, one of those August 26 sample sites—RTCR064—returned a Total Coliform–positive result and was also located **outside** the red-outlined "affected area."

132.    Defendant GW-Santa Cruz has suggested that contamination was minor and limited to a small portion of the system.

133.    In reality, its samples were sparse, uneven, and were drawn from both inside and **outside** the depicted "affected area," leaving large portions of the distribution system—including many residential neighborhoods—untested during the relevant period.

134.    By publishing and relying on the Affected Area Map, and by emphasizing that "only one of thirteen samples" was *E. coli*-positive, Defendant GW-Santa Cruz created the false impression that contamination was small in scope, neatly bounded, and that water outside the red outline was overwhelmingly safe.

135.    In truth, the actual geographic extent of contamination was **uncertain**, and Defendant GW-Santa Cruz's limited sampling—conducted after increasing chlorine levels and flushing portions of the system—provided no reliable basis for drawing a boundary or assuring customers outside the red outline that their water was safe.

///

**B.    Contamination Response**

136.    The Level 2 Assessment and associated records show that, from the outset, Defendant GW-Santa Cruz responded to the contamination in a way that obscured rather than clarified the nature, extent, and duration of the contamination event.

137.    On August 27, 2025—after being notified that a routine distribution sample was *E. coli*–positive—Defendant GW-Santa Cruz was required under 40 C.F.R. § 141.858 to collect repeat samples within 24 hours.

138.    Rather than ***promptly*** collecting those repeat samples under the same distribution-system conditions that produced the positive result, Defendant GW-Santa Cruz spent most of that 24-hour window hyper-chlorinating its system to approximately 2.3 ppm and flushing hydrants ***before*** taking the repeat samples. *Cf.* National Primary Drinking Water Regulations: Revisions to the Total Coliform Rule, 78 Fed. Reg. 10270, 10311 (Feb. 13, 2013) ("EPA believes that sampling again ***immediately*** after determining that a sample is positive (*i.e.*, conducting repeat sampling) increases the likelihood of identifying the source and/or nature of the possible contamination.").

139.    Although corrective actions such as increasing chlorine and flushing can be appropriate—and may even be the most health-protective immediate response to an *E. coli* detection—performing them before repeat sampling changes the conditions in the distribution system and undermines the public health purpose of the repeat-sampling requirement, which is to confirm whether contamination persists under the same system conditions that produced the positive result.

24

140. By chlorinating and flushing prior to repeat sampling, Defendant GW-Santa Cruz reduced the ability to determine the presence, source, and extent of *E. coli* and other fecal contamination in the distribution system and made the subsequent repeat test results less reliable indicators of whether the contamination had truly been resolved.

141. Defendant GW-Santa Cruz nonetheless later told customers that the RTCR "allows 24 hours to . . . conduct mitigating actions such as increasing chlorination and flushing," without disclosing that these actions can make follow-up samples appear superficially clean but still potentially dangerous. *See* GW-Santa Cruz's Advisory, www.gwresources.com/update (last visited Nov. 5, 2025); *but see* Yoshii, ADEQ Telephone Conf. (10/24/25) at 15:15-11:30 (ADEQ Manager stating "there are no specific rules in the Safe Drinking Water Act . . . either endorsing or preventing systems from doing any sort of disinfection between routine and a repeat [samples].").

### 1. Invalid Repeat Sampling and *E. coli* MCL Violation

142. Under the RTCR, a public water system incurs an *E. coli* MCL violation when, among other things, it fails to take all required repeat samples following a fecal-indicator–positive routine sample, or when a routine *E. coli*–positive sample is followed by a Total Coliform–positive repeat sample. See 40 C.F.R. §§ 141.860(a)(3), 141.63(c)(2).

143. In this case, Defendant GW-Santa Cruz's response to the August 26, 2025 *E. coli*–positive routine sample satisfied multiple independent *E. coli* MCL triggers under the RTCR.

144.    At a minimum, Defendant GW-Santa Cruz incurred an acute *E. coli* MCL violation based on the August 26 routine *E. coli*–positive result and the subsequent Total Coliform–positive repeat result, but it also failed to obtain valid, representative repeat samples within the framework contemplated by the RTCR.

145.    Disinfecting a distribution system before required repeat sampling—and then treating post-disinfection samples as if they fully characterize the original contamination event—is inconsistent with the RTCR's "find-and-fix" approach.

146.    Indeed, in this case Defendant GW-Santa Cruz obtained the *E. coli*–positive result lab results at 11:05 am on Wednesday, August 27, 2025, leaving ample time to immediately collect repeat samples before initiating any system-wide disinfection.

147.    Defendant GW-Santa Cruz's sequencing substantially undermined the intended confirmatory value of the required repeat sampling and made the subsequent repeat results less representative and less reliable as a reconstruction of the original distribution-system conditions.

148.    In short, disinfecting a system before repeat sampling is akin to disturbing a crime scene before investigators arrive—it can remove or suppress the very evidence the RTCR seeks to detect.

149.    Similarly, the spoliation doctrine recognizes that, even absent an express rule, parties have a duty to preserve evidence once they know or should know it may be relevant. *See Souza v. Fred Carries Contracts, Inc.,* 191 Ariz. 247 (App. 1997). Defendant

26

GW-Santa Cruz's pre-sampling disinfection had the same practical effect: it destroyed or altered the very microbiological evidence the RTCR exists to preserve.

150. The RTCR's structure reinforces this framework. For example, "special purpose samples" collected **after** corrective disinfection under 40 C.F.R. § 141.853(b) **cannot** be used to satisfy RTCR monitoring requirements or resolve *E. coli* triggers.

151. Likewise, EPA guidance emphasizes that repeat samples under § 141.858 are to be collected promptly after a positive routine result and before corrective measures that would mask contamination.

152. And finally, expedited corrective actions—such as temporary increases in chlorine residuals and flushing—are contemplated **after** an *E. coli* MCL violation has been triggered and sanitary defects are being addressed, but they do not excuse or substitute for the required sequence of repeat sampling and Tier 1 notification, nor do they authorize a system to rely on post-disinfection samples to diminish the seriousness of the event. See 40 C.F.R. § 141.859(b)(4).

153. Defendant GW-Santa Cruz publicly suggested that ADEQ approved their decision to hyper-chlorinate before repeat sampling and that ADEQ "approved [the] resampling process." *See* GW-Santa Cruz's Advisory, www.gwresources.com/update (last visited Nov. 5, 2025).

154. First, the RTCR does not allow a PWS to avoid or delay its monitoring and notification duties based on perceived or informal input from ADEQ, and no directive excusing Defendant GW-Santa Cruz's early disinfection was issued.

155.    Second, ADEQ personnel have indicated that, in fact, they did ***not*** direct GW-Santa Cruz's decision to hyper-chlorinate before repeat sampling and did not "weigh in" on that sequencing.

156.    When asked specifically about this on an October 24, 2025 conference call, James Stone, ADEQ Manager of Safe Drinking Water Monitoring and Protection, stated that "***it is not something we weigh in on one way or the other.***" *See* Yoshii, ADEQ Telephone Conf. (10/24/25) at 21:01–21:50.

### 2.    Chlorination and the Risk of Masking Contamination

157.    While increasing chlorine is a common corrective response once sanitary defects have been identified, the RTCR framework and EPA guidance emphasize collecting repeat samples before major corrective measures whenever feasible to avoid masking contamination. *See, e.g.*, Addressing Total Coliform Positive or *E. coli*-Positive Sample Results – EPA Region 8 Guidance; RTCR Implementation Challenges, National EPA Training (Sept. 25, 2019) ("***Take repeat samples before … other corrective measures. Otherwise, you are just masking the problem!***").

158.    Hyper-chlorination before collecting repeat samples can: (1) inactivate or suppress *E. coli*, leading to false-negative repeat results; (2) prevent accurate determination of the source or scope of contamination; and (3) induce *E. coli* into a viable but non-culturable ("VBNC") state, in which bacteria remain metabolically active but cannot be detected through standard EPA-approved culture methods.

159. Peer-reviewed studies have reported that exposure to chlorine can induce *E. coli* into a VBNC state.

160. In a VBNC state, bacteria can remain metabolically active, may retain virulence genes, and may resuscitate when disinfectant residuals dissipate or within the human intestinal tract while evading standard culture-based detection methods required under the RTCR.

161. Flushing and boosting chlorine before collecting repeat samples can "mask" contamination—reducing measured bacterial counts without necessarily eliminating the underlying health risk.

162. Accordingly, hyper-chlorinating the distribution system before completing mandatory repeat distribution sampling makes it substantially harder to use those samples to reconstruct the true extent, duration, and source of contamination.

163. While immediate disinfection may have been health-protective in the short term, Defendant GW-Santa Cruz's decision to rely on post-disinfection samples to reassure the public and to declare the event "fully resolved" undermined the informational and public health protections that the RTCR's repeat-sampling and Level 2 assessment processes are designed to provide.

164. Likewise, under all the circumstances in this case, a reasonable operator truly concerned with public safety—as opposed to simply getting clean repeat testing results—would have immediately obtained repeat samples before hyper-chlorinating the distribution system.

29

### 3. Repeat Sampling Results Confirming the *E. coli* MCL Violation

165. Under 40 C.F.R. § 141.63(c)(2), an *E. coli* MCL violation occurs when a routine *E. coli*–positive sample is followed by any Total Coliform–positive repeat sample.

166. Defendant GW-Santa Cruz's complete test results show that, in addition to a routine *E. coli*–positive test at RTCR056, routine testing at RTCR064 (another sample site) was also Total Coliform–positive on August 26, 2025.

167. In addition—and even after Defendant GW-Santa Cruz's hyper-chlorination and flushing—a repeat sample *upstream* of RTCR056, *i.e.*, within five service connections, was also Total Coliform–positive on August 28, 2025.

168. The August 26 *E. coli*–positive routine sample at RTCR056, followed by an upstream Total Coliform–positive repeat sample of RTCR056 on August 28, 2025, independently satisfied the condition for an *E. coli* MCL violation under 40 C.F.R. § 141.63(c)(2). *See* Yoshii, ADEQ Telephone Conf. (10/24/25) at 26:15-26:55 (ADEQ Manager stating that Defendant GW-Santa Cruz's Total Coliform–positive repeat sample triggered an "*E. coli* exceedance" and Tier 1 public notice requirement).

169. These results also suggest, at a minimum, that Defendant GW-Santa Cruz's hyper-chlorination and flushing were either ineffective at fully remediating the initial contamination or that the contamination was more extensive or persistent than assumed.

170. As noted above, Defendant GW-Santa Cruz's Level 2 Assessment omitted material facts—specifically, that other water samples had tested positive for Total

Coliform and that an upstream repeat sample in the area of RTCR056 was Total Coliform–positive, even after corrective actions.

171.    The complete Total Coliform–positive test results were not disclosed in the Level 2 Assessment, were not included in the Tier 1 public notice, and were not revealed during public meetings.

172.    They only became known after Plaintiff Terry Yoshii obtained test results from Defendant GW-Santa Cruz directly. *Cf.* Yoshii, ADEQ Telephone Conf. (10/24/25) at 55:40–56:11 (ADEQ advising that public water systems are to "***be transparent***" after any *E. coli* detection).

173.    Collectively, Defendant GW-Santa Cruz's invalid repeat sampling and the *E. coli* MCL violation confirmed by the August 26 routine and August 28 Total Coliform–positive repeat sample triggered a duty to issue a Tier 1 public notice "as soon as practical" under 40 C.F.R. § 141.202(a).

174.    Nevertheless, Defendant GW-Santa Cruz failed to properly notify the public "as soon as practical," instead delaying issuance of an effective Tier 1 notice while continuing to distribute water to customers whose true level of exposure risk was unknown.

### C.    *The Inadequate Public Notice and Public Misrepresentations*

175.    Compounding Defendant GW-Santa Cruz's sampling and response deficiencies was a communications failure that concealed rather than revealed the public health hazard.

31

**1. The Unlawfully Late Notice**

176. By the time Defendant GW-Santa Cruz issued any public notice on August 30, 2025, it had known for approximately *three days* that a routine distribution sample was *E. coli*–positive and, by the morning of August 29, 2025, had also received a Total Coliform–positive repeat result from an adjacent site—facts that, together, constituted an *E. coli* MCL violation and a Tier 1 situation under the RTCR. See 40 C.F.R. §§ 141.63(c)(2), 141.202(a).

177. Under 40 C.F.R. § 141.202(a)–(b), a public water system that experiences an *E. coli* MCL violation or other Tier 1 situation must issue a Tier 1 public notice "as soon as practical, but not later than 24 hours" after learning of the violation or circumstance.

178. Defendant GW-Santa Cruz instead waited until mid-morning on Saturday, August 30, 2025—*roughly 72 hours after first learning of the E. coli–positive result and nearly a full day after receiving the confirming Total Coliform–positive repeat result*—before issuing any form of public notice.

179. By approximately 11:00 a.m. on August 27, 2025, Defendant GW-Santa Cruz had been notified that routine sample RTCR056 was *E. coli*–positive, indicating a serious potential fecal-contamination event in the distribution system.

180. Yet Defendant GW-Santa Cruz did not prepare or issue a precautionary notice that day or the next, choosing instead to increase chlorination and flush the system while customers unwittingly continued to drink, cook with, and otherwise use tap water.

181. By approximately 11:00 a.m. on August 29, 2025, Defendant GW-Santa Cruz had received laboratory reports indicating that an upstream repeat sample close to RTCR056 was Total Coliform–positive, thereby satisfying the condition for an *E. coli* MCL violation under 40 C.F.R. § 141.63(c)(2) and confirming that a Tier 1 situation existed.

182. Even then, Defendant GW-Santa Cruz delayed preparing and ultimately distributing any notice until mid-morning on August 30, 2025, when it finally sent a last-minute bulk email with a trivial and anodyne subject line and ***no mention*** of "*E. coli*" in the body of the message.

183. Given the timing of the *E. coli*–positive result, the subsequent Total Coliform–positive repeat result, and the acute nature of the risk, Defendant GW-Santa Cruz's decision to wait until August 30, 2025 to notify the community was not "as soon as practical" within the meaning of 40 C.F.R. § 141.202 and unreasonably exposed customers to continued risk from potentially contaminated drinking water.

### 2. The Insufficient "Email" Notice

184. Apart from the timing of Defendant GW-Santa Cruz's response, its so-called "Tier 1 public notice" for this serious public health matter primarily consisted of a bulk email sent on August 30, 2025 that email was false, misleading, and inadequate to reasonably notify the public of an acute drinking-water hazard.

185. The email did not even mention the word *E. coli* **or** identify any risk or contamination discovered in the drinking water, and it gave no meaningful indication that

33

a serious public health event had occurred or that the public needed to take any precautions.

186. At the outset, the adequacy of the notice must be evaluated both in terms of *how* it was delivered and *what* it said.

187. First, under the RTCR, Tier 1 notice must be provided in a manner reasonably calculated to immediately reach "***all persons served***," including residential, commercial, transient, and non-transient users of the public water system. See 40 C.F.R. § 141.202(b)–(c).

188. ***The August 30 bulk email and other communications were not reasonably calculated to reach all persons served***.

189. According to Defendant GW-Santa Cruz's own statements, only 19,265 emails were sent to a system serving approximately 84,000 people—less than 25% of the population served. *See* City of Maricopa, Regular Council Meeting Video (Sept. 16, 2025) at 1:10:30–1:10:50.

190. Mr. Corwin further claimed that approximately 74% of those emails were opened which, even if accepted, would mean that fewer than 17%—less than one in five—of the people served by Defendant GW-Santa Cruz actually saw the notification. *Cf. id.* (Mr. Corwin stating, "we felt good about that.").

191. While email may be one acceptable component of a Tier 1 notification strategy, under these circumstances it was not sufficient by itself to "reach all persons served" as required by 40 C.F.R. § 141.202(b)–(c).

192. There is no known evidence that any contemporaneous notice was delivered to apartments, nursing homes, schools, restaurants, child-care facilities, parks, medical offices, hospitals, or other multi-user or sensitive facilities that rely on Defendant GW-Santa Cruz's water.

193. Second, as a matter of law a Tier 1 public notice must, at a minimum, include: the nature of the contamination; the source of contamination (if known); required health-effects language; clear precautionary measures (e.g., "boil your water before using," "do not drink the water," "use bottled water"); the population at risk; corrective actions underway; and, where possible, when safe water is expected to be restored. *See* 40 C.F.R. § 141.205.

194. ***None of that information was provided in the August 30 bulk email***.

195. The email—delivered without any "priority" designation and with the innocuous and forgettable subject line "*Global Water Customer Notice*"—did not mention the word *E. coli*, did not alert recipients that there had been an *E. coli* MCL violation, did not describe the contamination discovered in routine and repeat testing, did not advise them to stop using, discard, or boil tap water, and effectively ***discouraged*** further inquiry by prominently and repeatedly stating the "situation . . . was recently resolved" and "considered resolved" by ADEQ. The email is attached hereto as **Exhibit B** and incorporated herein by reference.

196. The email stated, in total (**bolded** as in the original):

Dear [Customer],

35

At Global Water, public health and safety is our top priority, and we have an exceptional compliance record of which we can be proud.

*We're sending this email to make you aware of a situation that was recently resolved.*

During recent routine monitoring, which consisted of dozens of samples from August 26th through August 28th, we received notification from our 3rd party laboratory that a water sample did not meet regulatory requirements. This sample result requires us to issue a Tier 1 Advisory to customers served within a specific area of our regional system that received the positive test result.

To address the issue, chlorination was increased and the system was flushed in the area of the positive test.

Repeat samples were taken and all samples collected are now testing negative.

**This event is considered resolved by the Arizona Department of Environmental Quality.**

Please visit our dedicated web page at https://www.gwresources.com/update to read the Advisory and learn more.

Thank you for being a valued Global Water Customer.

Global Water Resources

197.    This August 30 email did not satisfy the Tier 1 public notice requirements of the RTCR or Arizona's implementing regulations because it omitted, among other things, essential elements required for acute microbial contamination events, including clear identification of the *E. coli* MCL violation, the nature of the health risk, and explicit precautionary measures.

198.    The email did *not* include a conspicuous heading or any call-to-action such as "**DRINKING WATER NOTICE**" or "**BOIL WATER NOTICE**," did not provide clear precautionary measures, and bore little resemblance to ADEQ's standard Tier 1

36

template for acute microbial contamination events. Attached hereto and incorporated herein as **Exhibit C** is an ADEQ Tier 1 public notice template that informs customers of their "***right to know***" positive test results and plainly warns of associated public health risks.

199.    From the standpoint of a reasonable consumer, the text of Defendant GW-Santa Cruz's email discouraged further inquiry and conveyed the impression that there was no significant issue with the drinking water and that no consumer action or attention was necessary.

200.    Yet, at the very end of the email, after exalting that "public health and safety is our top priority," falsely and misleadingly claiming "a water sample did not meet regulatory requirements," repeatedly telling consumers the matter was "resolved," the email provided an entirely forgettable link to an alleged "Advisory."

201.    Defendant GW-Santa Cruz's "email-and-link" notice to "learn more" is the antithesis of a clear and meaningful Tier 1 public notice and does not comply with the RTCR or industry-standard public health expectations.

202.    Indeed, Defendant GW-Santa Cruz has provided no information regarding how many recipients actually "clicked through" to the linked webpage Advisory, a copy of which is attached hereto and incorporated herein as **Exhibit D**, further underscoring the limited reach of any substantive warning.

203.    Moreover, as alleged further below, even if the statements on the "linked webpage" were treated as part of Defendant GW-Santa Cruz's Tier 1 public notice, that

information too was incomplete, misleading, inconsistent, and wholly-insufficient to meaningfully warn the public of the *E. coli* contamination and associated health risks.

### 3. The False and Misleading Notice and Subsequent Statements

204. Defendant GW-Santa Cruz made statements in its email, on its linked webpage, and in public forums concerning the contamination event that were inaccurate, incomplete, inconsistent, and misleading in light of the actual monitoring data.

205. The statements contained in the email and/or linked webpage were false, misleading, incomplete, or otherwise deceptive in at least the following respects:

- stating or implying that only "a water sample" did not meet regulatory requirements, despite multiple related Total Coliform Rule triggers suggesting broader system contamination;

- omitting the true scope, nature, and context of the Total Coliform and *E. coli* testing results, including the extent of repeat sampling and key details regarding operational responses;

- characterizing the issue as "FULLY RESOLVED" before completing a valid assessment of the contamination event and while relevant questions about source, extent, and duration remained unanswered;

- misrepresenting or implying ADEQ's endorsement of Defendant GW-Santa Cruz's handling of the matter, including statements suggesting ADEQ had "approved" its actions;

- asserting or implying that "Your water is safe to drink," despite the recent *E. coli* detection, ongoing investigation, and incomplete understanding of the extent of contamination;

- failing to disclose the date of the positive *E. coli* result, the location of the affected sampling site, and the time period during which customers may have been exposed; and

- diminishing the severity of the public health risks associated with *E. coli* contamination and failing to adequately advise consumers of appropriate health-protective steps.

206. As with Defendant GW-Santa Cruz's Level 2 Assessment, the email and linked "Advisory" did not identify the facts that made a Tier 1 notice legally necessary, including the *E. coli* MCL violation and related Total Coliform-positive results.

207. Clicking through the email to the linked "Advisory" webpage led to a statement that "a water sample did not meet regulatory requirements" and "[t]his sample result requires us to issue the attached Tier 1 Advisory," but that "[t]he matter is FULLY RESOLVED."

208. These statements were false and misleading because, in fact, multiple water samples did not meet regulatory requirements, Defendant GW-Santa Cruz had not yet completed the mandatory Level 2 Assessment and, as alleged below, even Defendant GW-Santa Cruz cautioned against drinking water collected prior to August 29, 2025.

209. Likewise, even if ADEQ staff considered the matter "resolved" in an informal communication—despite multiple water samples not meeting regulatory requirements, not actually seeing laboratory results, and the absence of a completed mandatory Level 2 Assessment—that does not constitute a determination that Tier 1 content, timing, or distribution complied with RTCR requirements, and it does not

immunize Defendant GW-Santa Cruz from liability for misstatements, omissions, or delay.

210. What Defendant GW-Santa Cruz published was not a transparent, plain-language health warning, but a campaign of reassurance and self-promotion—designed more to preserve public confidence in the company than to meaningfully and clearly inform customers of a potential health risk.

211. The linked "Advisory" further stated that, after receiving an *E. coli*-positive result in one sample on August 27, additional samples were taken which came back "absent for *E. coli*, thus the event is resolved."

212. This was false and misleading because it omitted the Total Coliform-positive test results, which indicated ongoing microbiological concerns and triggered heightened public-notification duties.

213. The linked "Advisory" also implied ADEQ's endorsement of Defendant GW-Santa Cruz's "QUICK ACTIONS," including its decision to wait approximately 22 hours while increasing chlorination and flushing prior to repeat sampling.

214. This implication was false and misleading because ADEQ neither directed nor endorsed Defendant GW-Santa Cruz's early disinfection strategy or its "email-and-link" communication to the public.

215. In reality, ADEQ's communications—including any cursory staff-level approval of draft language—did not and could not purport to certify RTCR compliance with the content of the notice, did not bless the use of an "email-and-link" notice format,

40

or the "fully resolved/safe to drink" messaging, and did not waive GW-Santa Cruz's non-delegable obligations to provide timely, truthful, and complete Tier 1 public notice to all persons served.

216. The linked "Advisory" additionally told customers that their water was "safe to drink."

217. That assurance was misleading and inappropriate to provide without reliably identifying the source of contamination, completing a valid assessment, confirming that no viable pathogens remained in the system, or clearly warning customers about residual risks.

218. Only at the very end of the two-page email-linked "Advisory," after extensive self-praise regarding Defendant GW-Santa Cruz's "quick actions" and assurances that the water was "safe to drink," did Defendant GW-Santa Cruz finally include an inconsistent, inadequate, wholly-inconspicuous instruction to "***discard or boil***" water collected prior to August 29, 2025, referring vaguely to water in "carboys, water pitchers, etc."

219. No additional guidance was provided regarding water heaters, ice machines, pet bowls, kiddie pools, filter cartridges, beverage dispensers, or other equipment likely to retain contaminated water.

220. In substance, Defendant GW-Santa Cruz's notice functioned less as a public-safety announcement than as an advertisement and self-exoneration; it did not

operate as a clear, prominent, and transparent warning designed to protect the public and it diminished the severity and efficacy of the notice.

221.    Yet these themes were echoed and emphasized by Mr. Corwin at a Maricopa City Council meeting on September 16, 2025, where he stated publicly that "*this was not a public health crisis*" and that "*even ADEQ did not classify this as a crisis*." *See* City of Maricopa, Regular Council Meeting Video (Sept. 16, 2025) at 1:04:15–1:05:12; City of Maricopa, Regular Council Meeting Minutes (Sept. 16, 2025).

222.    This was a puzzling and inconsistent statement from a key representative of a company that had just, days before, purportedly issued the most serious type of public health notice that—albeit inadequately and diminishingly—called on customers to "discard or boil" any water collected prior to August 29, 2025.

223.    Likewise, Chris Krygier, Defendant GW-Santa Cruz's Regulatory Contact, stated that it was ADEQ's responsibility, not Defendant GW-Santa Cruz's, to decide whether a public notice was necessary and asserted that "*at no point did ADEQ recommend issuing precautionary or advisory notices.*" *See* City of Maricopa, Regular Council Meeting Video (Sept. 16, 2025) at 1:27:40–1:27:57.

224.    These statements were inaccurate, false, and misleading.

225.    During an October 24, 2025 conference call, ADEQ was asked directly:

*Did you guys have a conversation with Global Water? Is this a health emergency or crisis? . . . Did you say it was not?*

*See* Yoshii, ADEQ Telephone Conf. (10/24/25) at 55:40–56:11.

226.    James Stone, ADEQ Manager of Safe Drinking Water Monitoring and Protection, responded:

> *Never. We always treat E. coli super seriously. It is our recommendation from the very first E. coli detection is that they do precautionary boil water notices; that they do be transparent.*

*See* Yoshii, ADEQ Telephone Conf. (10/24/25) at 55:40–56:11.

227.    This mirrors EPA guidance, which makes clear that detection of *E. coli* in a distribution system indicates a "potential health hazard" and that any *E. coli* MCL violation is a "major violation" requiring immediate Tier 1 public notification by the PWS—not ADEQ. *See, e.g.*, EPA, RTCR State Implementation Guidance § 3.1.2 (June 2020); EPA, RTCR: A Quick Reference Guide (Sept. 2013).

228.    The bulk email, the hyperlinked "Advisory," and subsequent public statements—discouraging further inquiry, omitting material test results, suggesting there was no health emergency, and claiming ADEQ did not recommend precautionary notices or consider the situation serious—were directly contrary to regulatory expectations and established public health practice.

229.    This conduct also calls into question leadership of the PWS who claims the philosophical character of the company is its commitment to "***transparency***" and to "***do the right thing***." *E.g.*, *In re Application of Global Water – Santa Cruz Water Company, Inc.*, Docket No. W-20446A-25-0022 (Rate Application) (filed Dec.11, 2025) (testimony of Ron Fleming, on behalf of GW-Santa Cruz, repeatedly stating his philosophy for the company is "***do the right thing***.").

43

230. These public health communications were ***not*** "transparent," and these public health communications also do ***not*** reflect an alleged philosophy of "doing the right thing" for the Maricopa community.

231. Instead, these public health communications reflect a company that is interested in concealing and obfuscating public health information as opposed to fully informing and warning the public, as required by law and industry-standard public health practices.

232. Residents of the City of Maricopa deserve better from their regulated water utility, yet they have repeatedly been left to fend for themselves. *E.g.*, Brian Wright, *Maricopa Monitor* (Pinal Central), "'*Sicker than I've ever been'—Residents cry foul over water contamination*" (June 20, 2015) (quoting resident: "***I don't trust Global Water.***").

233. It is also only a matter of time before another *E. coli* emergency occurs, and Maricopa residents are understandably concerned and fearful. *See* City of Maricopa Council Meeting Minutes (Sept. 16, 2025) (statement by resident Dan Wilson referencing Walkerton, Ontario, where a similar four-day delay in public notification of *E. coli* contributed to multiple deaths and thousands of illnesses).

234. Indeed, Defendant GW-Santa Cruz has previously experienced Total Coliform-positive test results in this area that appear to have been *E. coli*-related and, as with the present event, diminished the significance of those findings. *E.g.*, Brian Wright, *Maricopa Monitor* (Pinal Central), "'*Sicker than I've ever been'—Residents cry foul over water contamination*" (June 20, 2015) (noting the utility described a prior event in similar

benign terms as merely "violat[ing] a drinking water standard" after detecting Total Coliforms in a Rancho El Dorado subdivision).

235. In addition, Defendant GW-Santa Cruz has a dubious regulatory history with ADEQ involving multiple "public notice violations," a long pattern of monitoring and reporting violations, and at least one MCL violation for uranium exceedance.

236. Defendant GW-Santa Cruz's record as a water system is hardly a model of a PWS that is "safe, compliant, and protective of public health."

237. And alarmingly, even since filing the original complaint in this matter, Alexsis Agent—another GW-Santa Cruz customer in Maricopa who became ill (along with her entire family) after the August 2025 *E. coli* contamination event—purchased EPA Compliant home water testing kits from AquaDx that returned a positive result for *E. coli* from her home drinking water on **December 3, 2025**.

238. Given this history and the conduct alleged herein, Plaintiffs and the proposed class face a credible ongoing threat of continuing wrongdoing, requiring this Court's intervention to ensure proper monitoring, transparency, notice and meaningful protection of public health going forward.

### D. The Attempt to Use ADEQ to Avoid Responsibility

239. As reflected in the foregoing allegations, Defendant GW-Santa Cruz has repeatedly exhibited lack of understanding, confusion, or at least inconsistency, about its public health responsibilities under Arizona law and the RTCR.

240. Defendant GW-Santa Cruz routinely attempts to invoke ADEQ's role as a shield, suggesting that any failure to warn, sample, or respond was a function of ADEQ's decisions.

241. But a PWS's statutory and regulatory duties under the RTCR—including providing compliant Tier 1 public notice—are non-delegable, and no involvement by ADEQ—real or perceived—alters Defendant GW-Santa Cruz's obligations.

242. Defendant GW-Santa Cruz nevertheless claimed, including in its linked website that "ADEQ's approval is required on… any resampling process and any required customer notification." *See* GW-Santa Cruz Advisory, www.gwresources.com/update (last visited Nov. 5, 2025).

243. These statements were inaccurate. Nothing in the RTCR requires ADEQ approval before a PWS conducts required repeat sampling or issues a Tier 1 public notice. Regardless, Defendant GW-Santa Cruz's characterizations of ADEQ's role do not relieve it of its independent statutory obligations.

244. ADEQ is a regulatory agency that provides oversight and may require corrective action, but it does not operate public water systems or directly deliver Tier 1 public notices to customers.

245. Those operational responsibilities rest with the public water system itself.

246. The RTCR expressly places responsibility for monitoring, sampling, reporting, notice, and public health protection on the public water system—not ADEQ. See 40 C.F.R. § 141.852(b); 40 C.F.R. § 141.202(c).

46

247. By contrast, ADEQ and its employees are generally shielded from civil liability for regulatory actions or omissions. Private water utilities, however, are not. They remain fully liable under Arizona law for negligence, misrepresentation, and statutory violations that injure the public.

248. Defendant GW-Santa Cruz's repeated assertions that ADEQ approved, authorized, or endorsed their delays in repeat sampling or public notice are both factually incorrect and do not relieve Defendant GW-Santa Cruz of its obligations.

249. ADEQ has no authority to waive the relevant statutory duties placed directly on a PWS, and in this case ADEQ did not issue any lawful directive or authorization excusing Defendant GW-Santa Cruz from its required actions.

250. Defendant GW-Santa Cruz cannot rely on informal communications, silence, or perceived approval from ADEQ staff (many of whom go on accept lucrative private-sector work for companies like Defendant GW-Santa Cruz) to delay or avoid required repeat sampling or Tier 1 public notification.

251. The RTCR contemplates agency involvement in oversight and, in some circumstances, notice *delivery methods*, but nothing in that oversight framework relieves the PWS of its own duty to provide timely, truthful, and complete Tier 1 public notice. *See* 40 C.F.R. §§ 141.202(a)–(b).

252. Likewise, even if ADEQ had informally told Defendant GW-Santa Cruz that the event was "resolved," that would not absolve Defendant GW-Santa Cruz of civil liability or diminish its lawful obligations. Regulatory standards set a minimum floor for

conduct; they do not create immunity from negligence or other claims, nor do they extinguish private rights of action.

253. Plaintiffs do not ask this Court to review, overturn, or second-guess any ADEQ regulatory decision—whether right or wrong. ADEQ's administrative actions, if any, concern only oversight and potential penalties and provide no compensation or direct relief to the residents who were exposed to contaminated water. Because ADEQ lacks authority to obtain such relief on behalf of consumers, private enforcement through this civil action is necessary to vindicate the public's rights and deter future violations.

254. Under Arizona law, the duties to ensure safe water, conduct proper monitoring, and provide timely, truthful public health warnings remain the sole and non-delegable responsibility of Defendant GW-Santa Cruz, and this action seeks to enforce those nondiscretionary duties designed to protect the public from exposure to unsafe drinking water.

255. Defendant GW-Santa Cruz's conduct, as alleged herein, undermined the RTCR's core purpose: to ensure rapid detection, transparent communication, and effective protection of the public from fecal contamination.

### *The Contamination Consequences*

256. As a result of Defendant GW-Santa Cruz's conduct, the vast majority of the affected public was left uninformed during a period when *E. coli* had been detected in the water distribution system and the true status of the system remained uncertain, even after the "email" notice.

257.    For days after Defendant GW-Santa Cruz received notice of the *E. coli*–positive routine sample, residents in the affected area continued to drink, cook, provide water for pets, and bathe in water that may have been contaminated, without any meaningful opportunity to take precautions.

258.    Most people in the affected area did not learn of Defendant GW-Santa Cruz's *E. coli* contamination event for weeks after Defendant GW-Santa Cruz sent the email. Many residents first learned of the event only when news of it began to circulate on social media.

259.    This caused anxiety, anger, loss of trust, and a risk of preventable illness. It also caused people to purchase bottled water, new water filters, home testing kits, water storage containers, water purification additives, and hand-operated water purification pumps.

260.    Some residents also became acutely ill, and some were hospitalized.

261.    Expert epidemiological and hydrological evidence—including symptom timelines, incubation periods, and mapping of reported illnesses—is expected to show that contamination within the distribution system likely pre-dated the August 26, 2025 routine sample by several days, consistent with contamination having begun on or before August 15, 2025.

262.    Because *E. coli* infection typically manifests within 2 to 10 days after ingestion of contaminated water, and because Defendant GW-Santa Cruz's own MSSP required only periodic sampling rather than continuous monitoring, the presence of fecal

49

contamination is consistent with contamination having begun on or before August 15, 2025—mirroring the onset dates of illness among several Plaintiffs and residents in the affected area.

263.    This inference is further supported by the fact that sample site RTCR056 had not previously been tested during August 2025.

264.    Although it is not yet clear how many people in the City of Maricopa were sickened by Defendant GW-Santa Cruz's *E. coli* contamination event, preliminary reports from potential claimants suggest a substantial number of acute gastrointestinal illnesses and other enteric infections consistent with *E. coli* exposure in the affected area, with the highest concentration in Rancho El Dorado and the immediately surrounding subdivisions in the City of Maricopa—the same area where RTCR056 was located.

### *The Lead Plaintiffs*

265.    Plaintiff Pauline Donatto is a citizen of Arizona, is domiciled in the Desert Passage neighborhood, and is a customer of Defendant GW-Santa Cruz. Ms. Donatto, who has never previously had acute cystitis (*i.e.*, a urinary tract infection), began experiencing painful urination and nausea in early September 2025. On September 19, 2025, she had a urine culture that tested *E. coli*-positive and she was prescribed antibiotics. She still lives in the City of Maricopa, still receives her water from Defendant GW-Santa Cruz, has no practical alternative to using their water, and continues to fear that similar *E. coli* or coliform events will recur and that Defendant GW-Santa Cruz will again under-inform or misinform her of public health risks in the drinking water.

266. Plaintiff Bradley Follett is a citizen of Arizona, is domiciled in the Alterra North neighborhood, and is a customer of Defendant GW-Santa Cruz. Mr. Follett has several serious health conditions, including diabetes and high blood pressure, which require him to monitor his health carefully. On August 26, 2025, however, he began to experience sudden abdominal cramps, nausea, diarrhea, unusual thirst, and kidney pain. Since he did not receive any notice from Defendant GW-Santa Cruz related to its *E. coli* contamination event, he did not know to see a doctor and, instead, self-treated at home for 2 days until the symptoms subsided. He still lives in the City of Maricopa, still receives his water from Defendant GW-Santa Cruz, has no practical alternative to using their water, and continues to fear that similar *E. coli* or coliform events will recur and that Defendant GW-Santa Cruz will again under-inform or misinform him of public health risks in the drinking water.

267. Plaintiff Linda Gagner is a citizen of Arizona, is domiciled in the Rancho El Dorado subdivision, and is a customer of Defendant GW-Santa Cruz. On August 27, 2025, she became very ill and had to cancel her twin's birthday party. Ms. Gagner experienced a bad headache, nausea, blurred vision, stomach pain, painful urination, and had a 102.7 degree fever. Ms. Gagner thought she may have contracted influenza so she did her best to rest and stay in bed until she could see her primary care physician.

268. Ms. Gagner saw her primary care doctor on September 10, 2025, mentioning her symptoms and her concern related to Defendant GW-Santa Cruz *E. coli* contamination. On September 14, 2025, her lab results were returned showing that she

had tested *E. coli*-positive. Although she was prescribed antibiotics she did not tolerate them well and continued experiencing symptoms again, including diarrhea.

269.    Ms. Gagner is a busy professional mother and did her best to treat her myriad of symptoms at home until October 20, 2025, when she could not take it any longer and contacted her physician. Another urine sample was taken and another *E. coli*-positive test was returned. Although she took another round of antibiotics, those too were not tolerated well and, on October 26, 2025, she was taken by ambulance to Chandler Regional.

270.    Ms. Gagner was admitted to Chandler Regional where they confirmed that Ms. Gagner's *E. coli*-infection, which had started as acute cystitis, had spread to her kidneys and had become septic. She remained in the hospital through October 31, 2025, when she was released to Aspen Home Health Care. At home, Ms. Gagner remained on intravenous fluids and medication from her infectious disease doctor and sees home health nurses throughout the week.

271.    As of November 14, 2025, Ms. Gagner has had her intravenous lines removed, but she remains under ongoing professional home health nursing care, with the supervision of an infectious disease doctor and numerous specialists, and continues to suffer from an acute kidney infection and diverticulitis. This has been devastating for her and her family—mentally, emotionally and financially.

272.    She still lives in the City of Maricopa, still receives her water from Defendant GW-Santa Cruz, has no practical alternative to using their water, and continues

to fear that similar *E. coli* or coliform events will recur and that Defendant GW-Santa Cruz will again under-inform or misinform her of public health risks in the drinking water.

273. Plaintiff Jon MacErnie is a citizen of Arizona, is domiciled with his incapacitated 12-year-old granddaughter, V. G. V. G. in the Palo Brea neighborhood, and is a customer of Defendant GW-Santa Cruz. V. G. is also an Arizona citizen. V. G. has a complex medical condition requiring specialized consideration. V. G. has panhypopituitarism, diabetes insipidus, non-verbal status, autism spectrum disorder, severe intellectual disabilities, blindness, reliance on wheelchair for mobility, epilepsy with a high risk of seizures, global developmental delay, gastrostomy tube dependent, and is immunocompromised.

274. V. G. requires constant supervision to ensure her well-being and has a significantly impaired hormonal stress response placing her at increased risk for severe complications from infection. In addition, her inability to communicate symptoms verbally and her dependence on others for mobility and care further heighten the risk and challenge to resolve a potentially life-threatening illness.

275. Just after August 30, 2025, V. G. became very ill for four days with severe, foul diarrhea that was runny and black. At the time, Jon was unaware of the *E. coli* contamination and the fact that this is an *E. coli* symptom. This was unusual for V. G. and, for someone as medically complex, a potentially life-threatening issue.

276. V. G. requires exactly 1,204 ml water every 24-hour period in her system by G-tube intake only. Any more or any less water in her system will cause provoked life-

threatening seizures. Severe bacterial diarrhea caused by *E. coli*, poses multiple life-threatening medical risks due to V. G. inability to self-regulate variable water intake and abnormal water releases (*e.g.*, diarrhea or excessive sweating releasing excessive water and sodium – she is also heat sensitive for this reason).

277. This ordinarily requires an emergency response; however, Jon was not aware of the *E. coli* contamination and did not understand the seriousness of this unknown public health threat. While regular diarrhea could be caused by excessive fiber, *E. coli*-related diarrhea requires a special hormonal response for fighting bacteria that V. G. body does not possess.

278. V. G. panhypopituitarism (underdeveloped pituitary gland) means she is hormone deficient, including hormones that control when to urinate, and thus requires the exact aforementioned water balancing in her system. This disease is known as diabetes insipidus ("DI") and causes the body to release irregular amounts of urine (this causes critical sodium fluctuations in V. G. bloodstream).

279. V. G. also lacks a thirst mechanism due to brain abnormalities and a prior stroke she suffered at 4 months of age. So, her drinking water amounts must be controlled with exactness permanently for the rest of her life. This creates a critical need to monitor V. G. water intake and sodium levels (by blood draws every 1 or 2 months) which are necessary for critical electrical impulses in her brain and vital organs.

280. If V. G. sodium levels are too high or too low, it will cause a hypernatremia or a hyponatremic provoked seizure, respectively. V. G. caretakers

must also ensure her current water intake every 24 hour period is within a sodium level "safe range." V. G. target sodium level range is managed and controlled higher than for a normal person. This "safe range" to prevent seizure activity for V. G. is 138 - 148 mEq/L, and a normal sodium range = 134 - 144 mEq/L.

281.   If V. G. has bacterial diarrhea like she did during the *E. coli* contamination incident, this could pose life threatening situations, as she could be losing too much water and/or electrolytes with runny diarrhea. Diarrhea can greatly and quickly destabilize V. G. and cause her to have life threatening seizures. Also, V. G. lacks the natural immune response to fight the *E. coli* bacteria which is also life-threatening. Indeed, V. G. may have actually had seizures during this time, but sometimes it is difficult to tell, as she is non-verbal. This also causes great dehydration, but V. G. cannot consume more than 1204ml of water daily, so she experiences a slow recovery for any illness with no extra fluid intake allowed.

282.   He still lives in the City of Maricopa, still receives his water from Defendant GW-Santa Cruz, has no practical alternative to using their water, and continues to fear that similar *E. coli* or coliform events will recur and that Defendant GW-Santa Cruz will again under-inform or misinform him of public health risks in the drinking water.

283.   Plaintiff John ("Jack") Podojil is a citizen of Arizona, is domiciled in the Rancho El Dorado subdivision, and is a customer of Defendant GW-Santa Cruz. On August 15, 2025, Mr. Podojil went to Dignity Health's emergency room because he was experiencing painful urination and was running a fever of 103.5 degrees. A urine culture

was obtained and showed Mr. Podojil was infected with *E. coli* and had blood in his urine. Although he was prescribed medication his condition worsened over the following weeks and he ultimately returned to his physician on September 19, 2025. A second urine culture was done showing the presence of *E. coli* in an amount > 100,000 cells/mL, after which he was prescribed additional antibiotics. He continued feeling symptoms for several weeks. He still lives in the City of Maricopa, still receives his water from Defendant GW-Santa Cruz, has no practical alternative to using their water, and continues to fear that similar *E. coli* or coliform events will recur and that Defendant GW-Santa Cruz will again under-inform or misinform him of public health risks in the drinking water.

284.    Plaintiff Krystal Stanley is a citizen of Arizona, is domiciled in the Rancho El Dorado subdivision, and is a customer of Defendant GW-Santa Cruz. On or about August 24, 2025, Ms. Stanley became violently ill, was experiencing both pelvic pain and painful urination, and went to Exceptional Healthcare Services where she was diagnosed with acute appendicitis and directed to Banner Desert for an emergency appendectomy that her doctors believe was related to acute cystitis caused by *E. coli* infection. Acute appendicitis is commonly associated with the presence of *E. coli*. She still lives in the City of Maricopa, still receives her water from Defendant GW-Santa Cruz, has no practical alternative to using their water, and continues to fear that similar *E. coli* or coliform events will recur and that Defendant GW-Santa Cruz will again under-inform or misinform her of public health risks in the drinking water.

285. Plaintiff Terry Yoshii is a citizen of Arizona, is domiciled in a Rancho El Dorado subdivision, and is a customer of Defendant GW-Santa Cruz. In late-August 2025, Mr. Yoshii fell ill and experienced painful urination and lethargy. Mr. Yoshii had laboratory testing done on September 2, 2025, which confirmed *E. coli* in an amount > 100,000 cells/mL and was prescribed antibiotics. He continued feeling symptoms for several weeks. He still lives in the City of Maricopa, still receives his water from Defendant GW-Santa Cruz, has no practical alternative to using their water, and continues to fear that similar *E. coli* or coliform events will recur and that Defendant GW-Santa Cruz will again under-inform or misinform him of public health risks in the drinking water.

### *Venue and Jurisdiction*

286. All acts and omissions alleged herein occurred in Pinal County, Arizona.

287. Venue in this Court is proper under the provisions of A.R.S. § 12-401(7).

288. This Court has subject matter jurisdiction under § 14(1) and § 14(3) of Article 6 of the Arizona Constitution, and under A.R.S. § 12-123.

289. This Court has personal jurisdiction over the parties.

290. Plaintiffs and the proposed classes assert only state-law causes of action.

291. Plaintiffs do not assert any claim under the Safe Drinking Water Act ("SDWA") or any other federal statute.

292. References to federal regulations are made solely because Arizona law incorporates and enforces those requirements through ADEQ's drinking-water rules,

57

and/or to describe the standard of care and duties applicable under Arizona law, including A.A.C. §§ R18-4-102, R18-4-105, R18-4-119, and R18-4-126(A). *See* 42 U.S.C. § 300j-8(e) (nothing in SDWA's citizen-suit provision restricts rights under any statute or common law to seek enforcement of SDWA requirements or "any other relief").

293.   Plaintiffs and the proposed classes seek relief only for violations of duties imposed by Arizona law and do not seek to create, enforce, or expand any federal cause of action.

### *Jury Trial*

294.   Plaintiffs and the proposed classes demand a trial by jury on all issues so triable.

### *The Proposed Subclasses*

295.   This action is brought, and may be maintained, as a class action because it satisfies the numerosity, commonality, typicality and adequacy requirements of Rule 23 of the Arizona Rules of Civil Procedure.

296.   Plaintiffs bring all claims herein individually and as a class action (for the proposed classes defined below) pursuant to Rule 23.

297.   Plaintiffs Donatto, Follett, Gagner, MacErnie (on behalf of V. G. V. G. an incapacitated minor), Podojil, Stanley, and Yoshii (together, "Plaintiffs") bring this action on their own behalf and on behalf of Subclass 1, pursuant to Rule 23(a) and 23(b)(2).

298.   Subclass 1 consists of all natural persons who, between August 15 and September 5, 2025, were Arizona citizens, domiciled in the City of Maricopa, Arizona, and who were customers of Defendant GW-Santa Cruz (PWS ID AZ04-11-131) within the City of Maricopa distribution system, regardless of whether they experienced any illness (the "Exposure Subclass").

299.   The Exposure Subclass seeks only declaratory and injunctive relief under Rule 23(b)(2); nothing herein precludes any member of this subclass from seeking individual damages arising from the same conduct, consistent with the Court's findings.

300.   Indeed, many members of the Exposure Subclass either suffered no documented illness or only modest, difficult-to-quantify harms such as anxiety and loss of trust. For those individuals, the cost and complexity of litigating systemic RTCR and public-notice violations would be grossly disproportionate to any individual recovery.

301.   Private enforcement through this class action is therefore necessary to vindicate the public health protections embodied in the RTCR and Arizona's public-notice requirements. The injunctive and declaratory relief requested will benefit all current and future customers of the system, including many residents who are not class members or have no intention of pursuing individual claims.

302.   Plaintiffs Donatto, Follett, Gagner, MacErnie (on behalf of V. G. V. G. Podojil, Stanley, and Yoshii bring this action on their own behalf and on behalf of Subclass 2, pursuant to Rule 23(a) and 23(b)(3).

303.    Subclass 2 consists of all natural persons who, between August 15 and September 5, 2025, were Arizona citizens, domiciled in the City of Maricopa, and who consumed or otherwise ingested drinking water supplied by Defendant GW–Santa Cruz (PWS ID AZ04-11-131) within the City of Maricopa distribution system and thereafter experienced acute gastrointestinal illness with onset between August 15 and September 20, 2025, inclusive, characterized by diarrhea ($\geq$3 loose stools in 24 hours) and at least one of vomiting, abdominal cramping, fever, or medically-documented dehydration; or received laboratory confirmation of *E. coli*/coliform infection or treating-provider diagnosis of acute infectious gastroenteritis consistent with enteric pathogen exposure, regardless of whether hospitalized (the "Illness Subclass").

### *Class Action Fairness Act Allegations (CAFA)*

304.    Plaintiffs, including the Exposure Subclass and Illness Subclass (together, "the class"), plead the following facts relevant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453, and 1711–1715, for the express purpose of demonstrating that this action is not properly removable to federal court.

305.    This case falls squarely within CAFA's "local controversy" and "home state" exceptions.

306.    The "local controversy" exception, 28 U.S.C. § 1332(d)(4)(A), applies when: greater than two-thirds of all proposed class members are citizens of the state in which the action was originally filed; at least one significant defendant from whom significant relief is sought, and whose alleged conduct forms a significant basis of the

claims, is a citizen of that state; the principal injuries resulting from the alleged conduct were incurred in that state; and no other class action asserting the same or similar allegations against any of the defendants has been filed within the preceding three years.

307. Likewise, the "home state" exception, § 1332(d)(4)(B), applies when "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, *and* the primary defendants, are citizens of the State in which the action was originally filed."

308. As pled herein, all requirements for CAFA's "local controversy" mandatory-remand exception is satisfied: more than two-thirds of class members are citizens of Arizona; a principal defendant, GW-Santa Cruz, is an Arizona citizen; all principal injuries occurred in Arizona; and no similar class action has been filed within the statutory period. 28 U.S.C. § 1332(d)(4)(A).

309. Likewise, since the defendants are citizens of the State in which the action was originally filed, all requirements for CAFA's "home state" exception is satisfied. 28 U.S.C. § 1332(d)(4)(B).

310. Plaintiffs plead these facts to give notice that CAFA's mandatory "local controversy" and "home state" exceptions apply on the face of the Complaint. Plaintiffs reserve all rights and remedies in the event any removal is attempted.

### *Class Action Allegations*

311. Applicable numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3) are met, as set forth below.

312.   While the exact number of class members is presently unknown, the members of the Exposure Subclass includes the approximately 75,000 persons domiciled in the City of Maricopa and served by Defendant GW-Santa Cruz.

313.   Likewise, early surveys of the affected area reveal over 100 persons in the Illness Subclass and that number could be substantially higher.

314.   The numbers of the class members are, therefore, so numerous that joinder of all members is impractical. The exact number of class members, however, can be easily determined once the class is certified.

315.   There are questions of law and fact common to the class members, the resolution of which will drive the outcome of this litigation, including but not limited to:

    (a)  whether Defendant GW-Santa Cruz's drinking water system experienced fecal contamination during the relevant period;

    (b)  whether Defendant GW-Santa Cruz engaged in a uniform course of conduct that breached duties owed to consumers under Arizona law;

    (c)  whether Defendant GW-Santa Cruz followed reasonable water-system practices during sampling, repeat sampling, and operational response to fecal contamination;

    (d)  whether Defendant GW-Santa Cruz provided timely, adequate, and effective warnings to affected residents, including whether its Tier 1 public notice was reasonably calculated to reach all persons served;

    (e)  whether Defendant GW-Santa Cruz's public statements, website postings, emails, and notices

62

omitted or misrepresented material facts regarding the contamination event;

(f)  whether Defendant GW-Santa Cruz's conduct constituted negligence, negligence *per se*, public nuisance under Arizona law;

(g)  whether Defendant GW-Santa Cruz acted reasonably in identifying, isolating, or addressing the source and extent of fecal contamination within the water system;

(h)  whether Defendant GW-Santa Cruz undertook operational or chlorination changes in a manner consistent with safe and reasonable water-utility practice;

(i)  whether the timing and adequacy of Defendant GW-Santa Cruz's warnings increased the likelihood or severity of *E. coli* exposure among consumers;

(j)  whether expert epidemiological and hydrological evidence demonstrates that contamination within the system likely pre-dated the August 26, 2025 routine sample;

(k)  whether Class-wide damages can be demonstrated using common evidence, including exposure probabilities, medical evidence, and water-system data;

(l)  whether the resolution of these common issues entitles Class members to declaratory, injunctive, and/or monetary relief; and

(m) whether Defendant GW-Santa Cruz, as the local operating utility, is the entity responsible for consumer communications, public notice, and operational decisions affecting the City of Maricopa.

316. These questions are not merely similar but arise from a single, uniform set of acts and omissions by Defendant GW-Santa Cruz, rendering their resolution in one proceeding both efficient and just. Indeed, the core legal and factual issues are not just shared; they are virtually identical. Regarding other legal issues, all class members are overwhelmingly Arizona residents, Defendant GW-Santa Cruz operates in Arizona, and all events at issue occurred in Arizona. The same statute of limitation applies on each cause of action, as do any affirmative defenses.

317. Plaintiffs have the same interests in this matter as all other members of the class, and their claims are typical of those of all members of the class. Their claims are coincident with and not antagonistic to those of other class members they seek to represent.

318. Plaintiffs and the proposed class have been harmed by Defendant GW-Santa Cruz's common course of conduct.

319. The harm to Plaintiffs and the proposed class was caused by Defendant GW-Santa Cruz's conduct.

320. Plaintiffs are committed to pursuing this action and have retained competent class counsel experienced in injury and class litigation. Plaintiffs will fairly and adequately represent the interest of the class members.

321. Class certification is appropriate under Rule 23(b)(1)(A) because separate actions by individual class members would create a risk of inconsistent or varying

adjudications with respect to individual class members that would establish an incompatible standard of conduct for Defendant GW-Santa Cruz.

322. Class certification is appropriate under Rule 23(b)(2) because Defendant GW-Santa Cruz's actions are generally applicable to the class as a whole and Plaintiffs and the proposed subclass seek equitable remedies with respect to the class.

323. Class certification is appropriate under Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

324. Regarding predominance, common questions of law lie at the heart of this matter and can be adjudicated as to all class members.

325. Regarding superiority, Rule 23(b)(3) directs the Court to look at the following: (a) the desirability of concentrating claims in this forum; (b) difficulties of management; (c) current claims by class members; and (d) class members' interest in controlling their individual claims.

326. Addressing forum desirability first, this is the only feasible forum for concentrating these claims and obtaining effective relief.

327. ADEQ's jurisdiction is regulatory and compliance-oriented, not remedial, and it lacks any mechanism for consolidating claims. *See* A.R.S. § 49-104; ADEQ, *Enforcement Actions for Drinking Water Systems*, https://azdeq.gov/enforcement-actions-drinking-water-systems (last visited on Nov. 5, 2025) ("Rather than use heavy-

handed compliance enforcement, we resolve the majority of violations through informal actions.").

328. While ADEQ may enforce environmental rules against Defendant GW-Santa Cruz, it has no jurisdiction over Defendant GWRI and cannot award damages, equitable restitution, or class-wide relief. *See* A.R.S. § 49-110 (authorizing only administrative enforcement actions and civil penalties not to exceed $25,000 per violation).

329. Likewise, ADEQ has no administrative procedure for resolving equitable or compensatory claims, and so there is no "exhaustion of administrative remedies" provision that bars direct judicial action or requires any form of pre-litigation complaint.

330. In addition, ADEQ has not initiated, and is not currently pursuing, any civil, administrative, or criminal enforcement action against Defendant GW-Santa Cruz arising out of the August 2025 *E. coli* contamination event or the public notice failures alleged in this Complaint.

331. In other words, Arizona law does not require Plaintiffs or class members to exhaust any administrative complaint process with ADEQ before pursuing these judicial claims, and in any event such a process would be futile and inadequate because ADEQ does not provide an adjudicatory forum capable of awarding the declaratory, injunctive, or monetary relief sought here, including corrective public notification and reforms to Defendant GW-Santa Cruz's contamination response, public notification practices, and compensation for harms suffered by affected residents.

66

332. Accordingly, judicial resolution through this Court is the only forum capable of affording complete, consistent, and meaningful redress to the affected Class.

333. Regarding difficulties of management, all defendants, Plaintiffs and the proposed class are in one state and mostly in one City, governed by the law of one state, Plaintiffs' preliminary discovery indicates the number of class members is manageable, the facts are remarkably uniform, if not identical, and the case turns on a limited number of legal issues.

334. Regarding the final two factors, Arizona courts have established the test as whether there is extensive pre-existing litigation that a class action would be unproductive.

335. In this case, there is no known pre-existing litigation; the complexity and expense, especially given the relief sought make individual actions impractical. From both judicial and litigant perspectives, there is no advantage in separate suits, which would reduce efficiency, litigation leverage, and available resources without improving prospects for recovery.

336. In sum, proceeding as a class action will avoid inconsistent rulings, promote fairness, and enhance judicial economy by resolving in one proceeding issues that would otherwise burden hundreds of individual cases.

337. Class certification is appropriate under Rule 23(c)(4) because resolution of key legal and factual issues common to the class will materially advance the litigation.

338.    Absent a class action, most of the class members will remain unaware of their rights or find the cost of individual litigating prohibitive, leaving them with no effective remedy. Class treatment of common questions of law and fact conserves judicial and party resources while promoting consistent adjudication.

339.    Plaintiffs will fairly and adequately represent and protect the interests of the proposed class.

340.    Plaintiffs have retained competent counsel with substantial experience in prosecuting complex litigation and class actions.

341.    Plaintiffs and counsel are committed to vigorously prosecuting this action on behalf of other respective class members and have the financial resources to do so.

342.    Neither Plaintiffs nor their counsel have any interests adverse to those of other members of the class.

343.    The nature of relief and amount of damages qualify this matter as a Tier 3 case in accordance with Rule 8(b)(2) of the Arizona Rules of Civil Procedure.

## COUNT ONE

### *Unduly Delayed & Inadequate Public Notification*
(Declaratory Judgment and Injunctive Relief)
[Against Defendant Global Water – Santa Cruz Water Company, Inc. Only]

344.    Plaintiffs and the Exposure Subclass incorporate all previous allegations as though specifically set forth herein.

345. This Count challenges timing and delivery method of the required Tier 1 public notice (*i.e.,* failure to provide the Tier 1 public notice "as soon as practical" and in a manner reasonably calculated to reach "all persons served.").

346. Plaintiffs and the Exposure Subclass are current residents and water customers within the affected area identified in Defendant GW-Santa Cruz's *E. coli* contamination map for the August 2025 event. They were persons served during that event and continue to rely on Defendant's water for daily household and personal use.

347. Plaintiffs and the Exposure Subclass cannot reasonably avoid future exposure to Defendant GW-Santa Cruz's notice failures because they must continue using Defendant GW-Santa Cruz's water for ordinary household needs and, absent Court-ordered compliance, face a credible risk that Defendant GW-Santa Cruz will again delay, dilute, diminish, or misstate Tier 1 warnings during future acute contamination events.

348. At the time of filing and continuing to the present, each of the named Plaintiffs in the Exposure Subclass is a current residential customer of Defendant GW-Santa Cruz and continues to receive, drink, bathe, cook with, and otherwise use water supplied by its public water system on a daily basis.

349. Plaintiffs reasonably expect and intend to remain customers of this system for the foreseeable future, and they cannot practically avoid reliance on Defendant GW-Santa Cruz's water service.

350. This Count seeks only a declaration of the parties' rights and obligations under existing Arizona law and ADEQ regulations incorporating the RTCR, and a

narrowly tailored injunction prohibiting materially delayed or ineffective Tier 1 notice practices and requiring future notices to be issued and communicated in compliance with those existing legal requirements. Plaintiffs and the Exposure Subclass do not ask the Court to set or alter rates, tariffs, service terms, or utility policy within the ACC's ratemaking jurisdiction, and do not ask the Court to dictate treatment, engineering design, or day-to-day system operations within ADEQ's technical oversight.

351.    The Court is asked only to apply objective legal requirements governing when Tier 1 notice must issue and whether the notice method/content is reasonably calculated to reach persons served and includes required information; how Defendant GW-Santa Cruz achieves compliance (consistent with ACC/ADEQ oversight) remains Defendant GW-Santa Cruz's choice.

352.    Plaintiffs and the Exposure Subclass bring this claim pursuant to the Arizona Uniform Declaratory Judgment Act (A.R.S. §§ 12-1831 to 1846) and Rule 57 of the Arizona Rules of Civil Procedure.

353.    On August 27, 2025, Defendant GW-Santa Cruz received a routine distribution-system sample result that was *E. coli*–positive. Under Arizona law and ADEQ regulations incorporating the RTCR, the detection required repeat sampling and, once repeat sampling indicated an *E. coli* MCL violation, Tier 1 public notification "as soon as practical," as alleged below.

354.    On August 29, 2025, at approximately 10:55 a.m., Defendant GW-Santa Cruz received a Total Coliform–positive repeat sample result following the *E. coli*–

70

positive routine sample. Under Arizona law, which adopts 40 C.F.R. § 141.63(c)(2), the combination of an *E. coli*–positive routine sample and a Total Coliform–positive repeat sample constitutes an *E. coli* MCL violation for acute health-effects purposes, triggering public notification duties.

355.    Upon incurring the *E. coli* MCL violation, Defendant GW-Santa Cruz was required by Arizona law to issue an emergency public notification "as soon as practical" (and in any event within 24 hours) and in a manner reasonably calculated to immediately reach "all persons served." *See* 40 C.F.R. § 141.202(a)–(c); A.A.C. R18-4-119.

356.    Defendant GW-Santa Cruz did not issue any public notice until mid-morning on August 30, 2025—approximately 3 days after receiving the initial *E. coli*–positive result and nearly a full day after confirmation of the *E. coli* MCL violation—and then only by sending a bulk email to a fraction of those persons served. Even if Defendant GW-Santa Cruz attempts to characterize the 24-hour limit as the governing benchmark, Arizona law requires notice "as soon as practical"—not at the last permissible moment—and Defendant GW-Santa Cruz delayed notice while crafting "reassure-first" messaging and routing the warning through a limited email channel.

357.    Under these circumstances—including the acute microbial risk, the short timeline for household protective action, and Defendant GW-Santa Cruz's chosen limited delivery method—the notice was not issued "as soon as practical" and was not reasonably calculated to immediately reach all persons served.

71

358.    The failure to provide timely, adequate Tier 1 notice also deprived Plaintiffs and the Exposure Subclass of information they were legally entitled to receive on an emergency basis to protect their health, constituting a concrete informational injury independent of any later illness.

359.    As alleged above, the delayed and inadequate notice caused Plaintiffs and members of the Exposure Subclass to unknowingly rely on potentially unsafe tap water without timely warning, to incur objective out-of-pocket mitigation costs (e.g., bottled water and substitute supplies), and to suffer a concrete informational injury from the denial of legally required emergency notice. Plaintiffs allege these facts to establish standing and irreparable harm supporting declaratory and injunctive relief.

360.    As a result of Defendant GW-Santa Cruz's unlawful acts and omissions, at least one named plaintiff, including Linda Gagner, was forced to discard stored water supplied by Defendant GW-Santa Cruz—incurring the loss of that stored water—and began purchasing bottled water and/or point-of-use treatment after the event. She continues to incur these expenses because of Defendant GW-Santa Cruz's refusal to comply with Tier 1 public notice requirements as described herein, Defendant GW-Santa Cruz's claims that its existing practices are legally sufficient, and Defendant GW-Santa Cruz's claims that *E. coli* contamination in its drinking water is not a Tier 1 acute microbial contamination event requiring the kind of urgent and adequate notice as required by the RTCR and applicable legal requirements.

361.    As a result of Defendant GW-Santa Cruz's unlawful acts and omissions, at least one named plaintiff, including Terry Yoshii, was forced to discard stored water supplied by Defendant GW-Santa Cruz—incurring the loss of that stored water—and began purchasing new water filters, home testing kits, water storage containers, water purification additives, whole house water filtration, and/or hand-operated water purification pumps after the event. He continues to incur these expenses because of Defendant GW-Santa Cruz's refusal to comply with Tier 1 public notice requirements as described herein, Defendant GW-Santa Cruz's claims that its existing practices are legally sufficient, and Defendant GW-Santa Cruz's claims that *E. coli* detection in its drinking water is not a Tier 1 acute microbial contamination event requiring the kind of urgent and adequate notice as required by the RTCR and applicable legal requirements.

362.    The foregoing are distinct and palpable injuries. Likewise, the dispute between Plaintiffs and Defendant GW-Santa Cruz about its obligations to provide sufficient Tier 1 public notice is a present existing controversy. These injuries are personal to Plaintiffs and the Exposure Subclass representatives and are not merely a generalized grievance shared in the abstract by the public at large.

363.    Contamination events and emergency notices arise on short timelines, and Defendant GW-Santa Cruz has not disavowed the challenged notice practices; absent prospective relief, Plaintiffs and the Exposure Subclass reasonably face a continuing risk of being subjected to the same deficient notice practices in future events.

73

364.    Defendant GW-Santa Cruz has not admitted fault and has not retracted public statements diminishing the seriousness of the event. Defendant GW-Santa Cruz continues to contend that its timing, delivery, and content of notice were lawful and that ADEQ's role supports that position—creating an ongoing dispute over Defendant GW-Santa Cruz's nondiscretionary notice obligations.

365.    Plaintiffs and the Exposure Subclass have standing to seek this relief because there is an actual, justiciable controversy between the parties as to the nondiscretionary timeliness and manner of Defendant GW-Santa Cruz's emergency public notification obligations following the *E. coli* MCL violation. Defendant GW-Santa Cruz's conduct was not an isolated mistake; it reflected a communications practice of "reassure-first" messaging—minimizing acute microbial risk, omitting key trigger facts, and invoking ADEQ to discourage protective action—creating an ongoing likelihood of recurrence.

366.    An actual, present controversy exists between Plaintiffs and the Exposure Subclass and Defendant GW-Santa Cruz regarding its obligations under the RTCR and Arizona law. Defendant GW-Santa Cruz contends that it complied with applicable monitoring and public-notice requirements and that there was no *E. coli* MCL violation or public-notice failure. Plaintiffs and the Exposure Subclass contend that Defendant GW-Santa Cruz did not comply with applicable monitoring and public-notice requirements and that there was an *E. coli* MCL violation and public-notice failure. A

judicial declaration resolving this dispute will clarify the parties' legal rights and obligations.

367. Defendant GW-Santa Cruz's acts and omissions violate, *inter alia*, the RTCR as adopted in A.A.C. R18-4-119 and R18-4-126(A), as well as A.R.S. § 36-601(18). Plaintiffs and the Exposure Subclass do not assert a private right of action directly under the RTCR, the Safe Drinking Water Act, or A.R.S. § 36-601(18); these provisions are cited solely as sources of nondiscretionary duties and standards of care cognizable under Arizona common law.

368. This Count seeks declaratory and injunctive relief under Arizona law to enforce nondiscretionary public-notice duties concerning the August 2025 *E. coli* contamination event. Defendant GW-Santa Cruz's failure to provide timely Tier 1 public notice and related communications constitutes a public-health nuisance and violates duties arising from A.R.S. §§ 36-601 and 49-104 and ADEQ's implementing regulations (A.A.C. Title 18, ch. 4), which incorporate and enforce the RTCR. To the extent negligence-per-se principles are referenced, they are cited solely as sources of duty and standards of care; Plaintiffs do not assert a private right of action directly under the SDWA or the RTCR.

369. Defendant GW-Santa Cruz continues to own and operate PWS 04-11-131, has experienced multiple Total Coliform and *E. coli* detections in recent years, and maintains that its notice practices challenged in this Complaint are lawful. Plaintiffs and the Exposure Subclass allege that the notice practices are presently unlawful. They also

face continuing and ongoing risk that contamination events will continue to recur and that they will again receive delayed public notices.

370. Plaintiffs and the Exposure Subclass have standing to seek this declaratory and injunctive relief because (a) they personally relied, or reasonably would rely, on Defendant GW-Santa Cruz's public communications regarding water safety, (b) they were directly affected by the August 2025 contamination event and the delayed public notice, (c) they personally rely on Defendant GW-Santa Cruz's water for their daily needs, (d) Defendant GW-Santa Cruz's challenged notice practices are ongoing, (e) Plaintiffs and the Exposure Subclass remain captive customers with no practical alternative source of potable water, and (f) the requested declarations and injunctions will materially reduce continuing harm and clarify Defendant GW-Santa Cruz's obligations going forward.

371. Defendant GW-Santa Cruz has not disavowed its notice and communication practices and continues to assert that its August 2025 response, including the timing of its public notice, was lawful and appropriate, notwithstanding Plaintiffs' allegations that it was untimely and inadequate.

372. Indeed, Defendant GW-Santa Cruz has not acknowledged any *E. coli* MCL violation, has openly diminished the seriousness of the August 2025 contamination event, and has not implemented any relevant changes to its monitoring, notification, or public-communication practices.

373. Likewise, based on these presently existing facts, Plaintiffs and the Exposure Subclass have a real, present, and immediate need to know whether Defendant GW-Santa Cruz's current emergency-notice practices comply with Arizona law and what timely Tier 1 public notice they are legally entitled to as ongoing customers of PWS 04-11-131.

374. The risk of future harm is not speculative because Plaintiffs and the Exposure Subclass allege the challenged notice and communication practices are systemic and policy-driven—reflected in uniform templates and standardized "resolved/advisory-link" messaging—and absent Court-ordered reforms, GW-Santa Cruz is reasonably likely to repeat the same deficient notice approach in the next contamination event.

375. Defendant GW-Santa Cruz's conduct is not an isolated mistake but part of a continuing policy and practice of: (a) delaying or diminishing public notices following *E. coli* detections; (b) obscuring the full extent of Total Coliform and *E. coli* testing results; and (c) mischaracterizing ADEQ's role in order to justify inadequate notification. Unless enjoined and declared unlawful, Defendant GW-Santa Cruz will continue to follow these policies and practices in responding to contamination events affecting Plaintiffs and the Exposure Subclass.

376. An injunction requiring timely, complete Tier 1 notice and prohibiting misleading "resolved/safe" statements absent the disclosures mandated by law will

directly reduce Plaintiffs' and the Exposure Subclass's risk of unknowingly ingesting potentially contaminated water in future Tier 1 events.

377.    Plaintiffs and the Exposure Subclass have a concrete, legally protected interest in receiving timely, truthful, and complete public notices and related information whenever *E. coli* is detected in Defendant GW-Santa Cruz's system. That interest is created by the RTCR and Arizona's implementing regulations, and exists independent of any particular episode of physical illness.

378.    Defendant GW-Santa Cruz's ongoing refusal to acknowledge an *E. coli* MCL violation and the continued dispute over the public notice and communication practices challenged in this Complaint, creates an ongoing controversy, a continuing injury, and substantial and recurring risk that Plaintiffs and the Exposure Subclass will be denied timely information necessary to protect themselves and their families.

379.    Without declaratory and injunctive relief, Plaintiffs and the Exposure Subclass will be precluded from enjoying safe drinking water at their homes without having to take unusual precautions due to Defendant GW-Santa Cruz's ongoing refusal to adhere to Tier 1 public notice requirements and its stated belief that *E. coli* contamination is not a Tier 1 acute microbial contamination event warranting prompt, truthful, and complete information be provided to those served by its distribution system. A declaration and injunction requiring truthful, complete, and RTCR-compliant public notices will directly protect their concrete interests in safe drinking water.

380. A declaration that Defendant GW-Santa Cruz's notification practices violate the RTCR and Arizona law, coupled with forward-looking injunctive relief requiring compliance with existing Tier 1 timing, delivery, and content rules, will materially reduce the risk that Plaintiffs and the Exposure Subclass will again be exposed to contaminated water without timely warning. Such relief will require Defendant GW-Santa Cruz to maintain and implement written Tier 1 public notice procedures and to use delivery methods reasonably calculated to reach all persons served, consistent with 40 C.F.R. § 141.202 and A.A.C. R18-4-119.

381. A judicial declaration and permanent injunction requiring Defendant GW-Santa Cruz to issue timely, adequate notices will redress Plaintiffs' and the Exposure Subclass's concrete interests by ensuring they have access to safe drinking water and protection from delays in public notification of contamination.

382. The declaratory and injunctive relief sought would materially redress Plaintiffs' and the Exposure Subclass's ongoing risk of exposure to contaminated water and the need to incur out-of-pocket costs for bottled water, new filters, home testing kits and other related expenses, thereby redressing these continuing injuries while materially reducing public health risk, increasing transparency, and improving public trust and confidence. These precautionary expenditures are alleged solely to establish injury-in-fact, irreparable harm, and redressability for equitable relief, and are not sought as classwide damages for the Exposure Subclass.

383. Because Plaintiffs and the Exposure Subclass are presently forced to take extraordinary precautions and incur out-of-pocket costs solely due to uncertainty about Defendant GW-Santa Cruz's notice practices, upon entry of declaratory and injunctive relief, Plaintiffs and the Exposure Subclass reasonably expect that they will be able to rely on Defendant GW-Santa Cruz's public notices to determine when their tap water is safe, will reduce or discontinue extraordinary precautionary measures such as purchasing bottled water and redundant filtration solely because of uncertainty about notification practices, and will thereby mitigate or avoid further out-of-pocket costs and anxiety attributable to the challenged conduct.

384. Determining whether Defendant's public notice was unduly delayed under the RTCR is a straightforward legal issue typically resolved by applying objective notice requirements, without second-guessing technical treatment decisions or ratemaking policy. Likewise, here, this Court is asked to determine the meaning and application of Arizona drinking-water requirements in the familiar setting of a class action between private parties.

385. Under the circumstances alleged herein, Plaintiffs and the Exposure Subclass are entitled to a judicial declaration that, pursuant to the RTCR and Arizona law, Defendant GW-Santa Cruz's public notification was not delivered "as soon as practical" and was not provided in a manner reasonably calculated to immediately reach "all persons served."

386.    Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a permanent injunction prohibiting Defendant GW-Santa Cruz, after any *E. coli* detection or MCL violation triggering Tier 1 notice, from delaying Tier 1 public notice beyond the timeframe required by 40 C.F.R. § 141.202(a) and A.A.C. R18-4-119. Defendant GW-Santa Cruz may undertake flushing, chlorination, repeat sampling, or other operational steps where deemed appropriate, but such steps shall not delay, excuse, or extend the Tier 1 notice deadline beyond "as soon as practical" (and no later than 24 hours) after learning of the Tier 1 trigger.

387.    Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a permanent injunction requiring Defendant GW-Santa Cruz, upon any Tier 1 trigger event, to provide public notice using one or more delivery methods (individually or in combination) that are reasonably calculated to reach all persons served, including customers who may not receive email notices, and including sensitive populations and community facilities.

388.    Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a permanent injunction ordering Defendant GW-Santa Cruz to ensure that Tier 1 notices are delivered "as soon as practical," in a manner reasonably calculated to reach "all persons served," pursuant to 40 C.F.R. § 141.202 and A.A.C. R18-4-119, and include the information required by 40 C.F.R. §§ 141.202–141.205 (as incorporated by Arizona law). Defendant GW-Santa Cruz shall maintain and implement written Tier 1 public-

notice procedures reasonably designed to ensure compliance with the timing, delivery, and required-content rules, subject to ACC/ADEQ oversight as applicable.

389.    Any injunctive relief should be narrowly tailored to enforce Defendant GW-Santa Cruz's existing public-notice and risk-communication duties under Arizona law and the RTCR (as incorporated by ADEQ regulations), and to prevent delayed, ineffective, or misleading communications.

390.    Successful prosecution of this declaratory and injunctive claim will confer a significant benefit on the public at large by improving the timeliness, clarity, and reach of drinking-water notices for all current and future customers of PWS 04-11-131, irrespective of whether they suffered illness or pursue individual damages.

## COUNT TWO

### *False and Misleading Public Notification*
(Declaratory Judgment and Injunctive Relief)
[Against Defendant Global Water – Santa Cruz Water Company, Inc. Only]

391.    Plaintiffs and the Exposure Subclass incorporate all previous allegations as though specifically set forth herein.

392.    This Count challenges Defendant GW-Santa Cruz's Tier 1 public notice and related communications as false and misleading in substance and format (*e.g.*, email-and-link format), including affirmative misstatements, material omissions, contradictory "reassure-first" messaging, and presentation choices that diminished the operative Tier 1 warning and its required protective instructions.

393.    Plaintiffs and the Exposure Subclass are current residents and water customers within the affected area identified in Defendant GW-Santa Cruz's *E. coli* contamination map for the August 2025 event, and they continue to rely on Defendant's water for daily household and personal use.

394.    Plaintiffs and the Exposure Subclass cannot reasonably avoid future exposure to Defendant GW-Santa Cruz's notice failures because they must continue using Defendant GW-Santa Cruz's water for ordinary household needs and, absent Court-ordered compliance, face a credible risk that Defendant GW-Santa Cruz will again delay, dilute, diminish, or misstate Tier 1 warnings during future acute contamination events.

395.    At the time of filing and continuing to the present, each of the named Plaintiffs in the Exposure Subclass is a current residential customer of Defendant GW-Santa Cruz and continues to receive, drink, bathe, cook with, and otherwise use water supplied by its public water system on a daily basis.

396.    Plaintiffs reasonably expect and intend to remain customers of this system for the foreseeable future, and they cannot practically avoid reliance on Defendant GW-Santa Cruz's water service.

397.    This Count seeks only a declaration of the parties' rights and obligations under existing Arizona law and ADEQ regulations incorporating the RTCR, and a narrowly tailored injunction prohibiting materially delayed or ineffective Tier 1 notice practices and requiring future notices to be issued and communicated in compliance with those existing legal requirements. Plaintiffs and the Exposure Subclass do not ask the

Court to set or alter rates, tariffs, service terms, or utility policy within the ACC's ratemaking jurisdiction, and do not ask the Court to dictate treatment, engineering design, or day-to-day system operations within ADEQ's technical oversight.

398. The Court is asked only to apply objective legal requirements governing when Tier 1 notice must issue and whether the notice method/content is reasonably calculated to reach persons served and includes required information; how Defendant GW-Santa Cruz achieves compliance (consistent with ACC/ADEQ oversight) remains Defendant GW-Santa Cruz's choice.

399. Plaintiffs and the Exposure Subclass bring this claim pursuant to the Arizona Uniform Declaratory Judgment Act (A.R.S. §§ 12-1831 to 1846) and Rule 57 of the Arizona Rules of Civil Procedure.

400. On August 27, 2025, Defendant GW-Santa Cruz received a routine distribution-system sample result that was *E. coli*–positive. Under the RTCR and Arizona law, that detection required immediate investigation and compliance with repeat-sampling and Tier 1 notification requirements triggered by an *E. coli* MCL violation, as alleged below.

401. On August 29, 2025, at approximately 10:55 a.m., Defendant GW-Santa Cruz received a Total Coliform–positive repeat sample result following the *E. coli*–positive routine sample. Under 40 C.F.R. § 141.63(c)(2), as adopted by Arizona, the combination of an *E. coli*–positive routine sample and a Total Coliform–positive repeat

sample constitutes an *E. coli* MCL violation for acute health-effects purposes, triggering public notification duties.

402.    Following the *E. coli* detection and resulting E. coli MCL violation described above, Defendant issued a purported Tier 1 public notice by sending a bulk email to certain customer accounts that contained reassuring text and a hyperlink to a separate web-based "Advisory" (an "email-and-link" notice).

403.    This "email-and-link" approach did not satisfy Tier 1 public-notice requirements (as incorporated into Arizona law) because it was not reasonably calculated to reach all persons served and it did not deliver the operative warning in a clear, prominent, and timely manner.

404.    Tier 1 notice cannot be satisfied by communications that—through timing, placement, or content—materially downplay or diminish an acute microbial risk or omit required warning information such that a reasonable person served would not understand that immediate protective action is necessary.

405.    The body of Defendant GW-Santa Cruz's email—including bolded language—communicated reassurance and "resolved/safe" messaging that, from the perspective of a reasonable consumer, diminished the urgency of the event and discouraged protective action and further investigation, while omitting or obscuring the trigger facts that made immediate household precautions necessary.

406.    Only after that reassurance did the email include a hyperlink—effectively requiring recipients to (a) receive the email, (b) open it, (c) locate and click the link, and

(d) access and read separate content—before learning the warnings and instructions Defendant contends were required.

407. A Tier 1 warning is inadequate when the operative emergency information is not delivered in a clear and prominent manner and is instead buried behind a discretionary click-through process, such that the notice is not reasonably calculated to timely inform persons served.

408. The email-and-link method fails to reach many persons served who drink and use the water but are not the listed account holder (including tenants, other household residents, and visitors), and therefore fails the requirement that the notice method be reasonably calculated to reach persons served. Coupled with Defendant GW-Santa Cruz's undue "resolved/safe" framing and other misleading communications alleged above, Defendant GW-Santa Cruz's notice delivery and content were materially misleading by omission and inadequate as a Tier 1 public notification.

409. The linked Advisory was false and misleading because it prominently assured customers the incident was "fully resolved" and that their water was "safe to drink," and attributed that conclusion to ADEQ, while omitting the Tier 1 trigger facts and regulatory basis for the notice—including that Defendant had received an *E. coli*–positive routine sample and then a Total Coliform–positive repeat sample that, under 40 C.F.R. § 141.63(c)(2) (as adopted by Arizona), constitutes an acute E. coli MCL violation requiring Tier 1 notice. The Advisory disclosed only selected "negative" testing information without clearly disclosing the positive results and what they meant for Tier 1

notice. It then—in an asterisked/late-notice section—included standard health-effects language and precautionary instructions (including boiling water or using bottled water, using alternate sources "until you are notified that the water is safe," discarding previously collected water, and flushing stagnant faucets). This juxtaposition of categorical "safe/resolved" assurances with emergency health-effects and boil-water precautions rendered the notice contradictory and confusing, diluted the Tier 1 warning, and was not reasonably calculated to inform persons served of the nature of the acute microbial risk or the immediate protective actions required. Reasonable customers were left to guess whether a Tier 1 emergency had occurred at all, and whether immediate protective action was necessary.

410.    Plaintiffs and the Exposure Subclass are persons served and the intended recipients of Tier 1 emergency notices and must make immediate household health and safety decisions based on those communications. Defendant GW-Santa Cruz's false, misleading, and incomplete notice deprived them of timely, accurate, and complete emergency information required by law, causing concrete injury and ongoing risk of harm. Absent lawful, complete notice, they must either over-mitigate at personal expense or risk exposure—harm redressable by prospective compliance relief.

411.    As alleged above, the false and misleading notice deprived Plaintiffs and members of the Exposure Subclass of truthful, complete, and prominent emergency warning and instructions, resulting in unknowing consumption of potentially contaminated water, out-of-pocket costs for bottled water, home testing kits, and

substitute supplies, including changing water filters and experiencing ongoing fear, anxiety, and loss of trust in their community water system stemming from the increased risk of serious illness and their lack of information about when the water was unsafe. Plaintiffs and members of the Exposure Subclass allege these facts to establish standing and irreparable harm supporting declaratory and injunctive relief; Plaintiffs and the Exposure Subclass do not seek any monetary award in this Count.

412.    As a result of Defendant GW-Santa Cruz's unlawful acts and omissions, at least one named plaintiff, including Linda Gagner, was forced to discard stored water supplied by Defendant GW-Santa Cruz—incurring the loss of that stored water—and began purchasing bottled water and/or point-of-use treatment after the event. She continues to incur these expenses because of Defendant GW-Santa Cruz's refusal to comply with Tier 1 public notice requirements as described herein, Defendant GW-Santa Cruz's claims that its existing practices are legally sufficient, and Defendant GW-Santa Cruz's claims that *E. coli* contamination in its drinking water is not a serious public health emergency requiring truthful, complete, and prominent notice as required by the RTCR and applicable standards of care.

413.    As a result of Defendant GW-Santa Cruz's unlawful acts and omissions, at least one named plaintiff, including Terry Yoshii, was forced to discard stored water supplied by Defendant GW-Santa Cruz—incurring the loss of that stored water—and began purchasing new water filters, home testing kits, water storage containers, water purification additives, whole house water filtration, and/or hand-operated water

purification pumps after the event. He continues to incur these expenses because of Defendant GW-Santa Cruz's refusal to comply with Tier 1 public notice requirements as described herein, Defendant GW-Santa Cruz's claims that its existing practices are legally sufficient, and Defendant GW-Santa Cruz's claims that *E. coli* contamination in its drinking water is not a serious public health emergency requiring truthful, complete, and prominent notice as required by the RTCR and applicable standards of care.

414.    The foregoing are distinct and palpable injuries. Likewise, the dispute between Plaintiffs and Defendant GW-Santa Cruz about its obligations to provide sufficient Tier 1 public notice is a present existing controversy. These injuries are personal to Plaintiffs and the Exposure Subclass representatives and are not merely a generalized grievance shared in the abstract by the public at large.

415.    Tier 1 contamination events unfold on short timelines, and Defendant GW-Santa Cruz has not disavowed the challenged notice practices; absent prospective relief, Plaintiffs and the Exposure Subclass reasonably face a continuing risk of being subjected to the same misleading notice practices in future events.

416.    Defendant GW-Santa Cruz has not admitted fault and has not retracted public statements diminishing the seriousness of the event. Defendant GW-Santa Cruz continues to contend that its timing, delivery, and content of notice were lawful and that ADEQ's role supports that position—creating an ongoing dispute over Defendant GW-Santa Cruz's nondiscretionary notice obligations. Any informal ADEQ input or "approval for use" communications do not constitute a binding agency adjudication of compliance,

89

and do not relieve Defendant of its nondiscretionary duty to issue legally sufficient Tier 1 notice to all persons served.

417.    An actual, present controversy exists between Plaintiffs and the Exposure Subclass and Defendant GW-Santa Cruz regarding its obligations under the RTCR and Arizona law. Defendant GW-Santa Cruz contends it complied with applicable monitoring and public-notice requirements and that there was no *E. coli* MCL violation or public-notice failure. Plaintiffs and the Exposure Subclass contend that Defendant GW-Santa Cruz did not comply with applicable monitoring and public-notice requirements and that there was an *E. coli* MCL violation and public-notice failure. A judicial declaration resolving this dispute will clarify the parties' legal rights and obligations.

418.    Defendant GW-Santa Cruz's acts and omissions violate, *inter alia*, the duties as adopted in A.A.C. R18-4-119 and R18-4-126(A), as well as A.R.S. § 36-601(18). Plaintiffs and the Exposure Subclass do not assert a private right of action directly under the RTCR, the Safe Drinking Water Act, or A.R.S. § 36-601(18); these provisions are cited solely as sources of nondiscretionary duties and standards of care cognizable under Arizona common law.

419.    This Count seeks declaratory and injunctive relief under Arizona law to declare Defendant GW-Santa Cruz's nondiscretionary notice obligations (as incorporated into Arizona law) and to enjoin materially false, misleading, or noncompliant Tier 1 communications concerning the August 2025 event. Defendant GW-Santa Cruz's false, misleading, and incomplete Tier 1 public notices and related communications constitute

a public-health nuisance and violate duties arising from A.R.S. §§ 36-601 and 49-104 and ADEQ's implementing regulations (A.A.C. Title 18, ch. 4), which incorporate and enforce the RTCR. To the extent negligence-per-se principles are referenced, they are cited solely as sources of duty and standards of care; Plaintiffs do not assert a private right of action directly under the SDWA or the RTCR.

420.    Defendant GW-Santa Cruz continues to own and operate PWS 04-11-131, has experienced multiple Total Coliform and *E. coli* detections in recent years, and maintains that its notice practices challenged in this Complaint are lawful. Plaintiffs and the Exposure Subclass allege that the notice practices challenged in this Complaint are unlawful. They also face a continuing and ongoing risk that contamination events will recur and that they will again be sent incomplete or misleading public notices.

421.    Plaintiffs and the Exposure Subclass have standing to seek this declaratory and injunctive relief because (a) they are persons served and were directly affected by Defendant GW-Santa Cruz's false and misleading August 30, 2025 "email-and-link" Advisory, (b) they rely on Defendant GW-Santa Cruz's water for daily needs and cannot practically avoid that service, (c) Defendant GW-Santa Cruz's challenged notice and communication practices are ongoing and not disavowed, (d) Plaintiffs and the Exposure Subclass face a continuing risk of recurrence, and (e) the requested declarations and injunctions will materially reduce ongoing harm and clarify Defendant GW-Santa Cruz's nondiscretionary notice obligations going forward. Moreover, Defendant GW-Santa Cruz's conduct was not an isolated mistake; it reflected a communications practice of

"reassure-first" messaging—minimizing acute microbial risk, omitting key trigger facts, and invoking ADEQ to discourage protective action—creating an ongoing likelihood of recurrence.

422. Defendant GW-Santa Cruz has not disavowed its notice and communication practices and continues to assert that its August 30, 2025 public notice was lawful and appropriate, notwithstanding Plaintiffs' allegations that it was false and misleading. Indeed, Defendant GW-Santa Cruz has not acknowledged any *E. coli* MCL violation, has openly diminished the seriousness of the August 2025 contamination event, and has not implemented any relevant changes to its monitoring, notification, or public-communication practices.

423. Likewise, based on these presently existing facts, Plaintiffs and the Exposure Subclass have a real, present, and immediate need to know whether Defendant GW-Santa Cruz's current emergency-notice practices comply with Arizona law and what timely public-health notification they are legally entitled to as ongoing customers of PWS 04-11-131. The risk of future harm is not speculative because Plaintiffs and the Exposure Subclass allege the challenged notice and communication practices are systemic and policy-driven—reflected in uniform templates and standardized "resolved/advisory-link" messaging—and absent Court-ordered reforms, GW-Santa Cruz is reasonably likely to repeat the same deficient notice approach in the next contamination event.

424. Defendant GW-Santa Cruz's conduct is not an isolated mistake but part of a continuing policy and practice of: (a) delaying or minimizing public notices following

*E. coli* detections; (b) obscuring the full extent of Total Coliform and *E. coli* testing results; and (c) mischaracterizing ADEQ's role in order to justify inadequate notification. Unless enjoined and declared unlawful, Defendant GW-Santa Cruz will continue to follow these policies and practices in responding to contamination events affecting Plaintiffs and the Exposure Subclass. An injunction requiring timely, complete Tier 1 notice and prohibiting misleading "resolved/safe" statements absent the disclosures mandated by law will directly reduce Plaintiffs' and the Exposure Subclass's risk of unknowingly ingesting potentially contaminated water in future Tier 1 events.

425. Plaintiffs and the Exposure Subclass have a concrete, legally protected interest in receiving timely, truthful, prominent, and complete public notices and related information whenever *E. coli* is detected in Defendant GW-Santa Cruz's system. That interest is created by standards of care, the RTCR and Arizona's implementing regulations, and exists independent of any particular episode of physical illness.

426. Defendant GW-Santa Cruz's ongoing refusal to acknowledge an *E. coli* MCL violation and the continued dispute over the public notice and communication practices challenged in this Complaint, create an ongoing controversy, a continuing injury, and substantial and recurring risk that Plaintiffs and the Exposure Subclass will be denied truthful and complete information necessary to protect themselves and their families.

427. Without declaratory and injunctive relief, Plaintiffs and the Exposure Subclass will be precluded from enjoying safe drinking water at their homes without

having to take unusual precautions due to Defendant GW-Santa Cruz's ongoing refusal to adhere to Tier 1 public notice requirements and its stated belief that *E. coli* contamination is not a serious public health emergency warranting prompt, truthful, and complete information be provided to those served by its distribution system. A declaration and injunction requiring truthful, complete, and RTCR-compliant public notices will directly protect their concrete interests in safe drinking water.

428. Defendant GW-Santa Cruz's false and misleading notice is directly connected to existing public health risk and harm—namely, the consumption of unsafe water, potential illness, and erosion of trust. Injunctive relief is meaningful here because it will materially reduce public health risk, increase transparency, and improve public trust and confidence.

429. A declaration that Defendant GW-Santa Cruz's public-notification practices violated Arizona law and ADEQ regulations incorporating the RTCR, coupled with forward-looking injunctive relief requiring compliance with the RTCR's timeliness, delivery, and content requirements (as incorporated by Arizona law), will materially redress Plaintiffs' and the Exposure Subclass's concrete interests by ensuring they receive prompt, accurate, and complete information necessary to protect their households during future contamination events. Such relief is administrable and does not require this Court to set rates, dictate engineering design, or supervise day-to-day operations: Defendant may choose the means of compliance, but must maintain and implement written Tier 1 public notice and risk-communication procedures ensuring that (a) notice is issued "as

soon as practical" (and no later than 24 hours) after learning of a Tier 1 trigger; (b) to use delivery methods reasonably calculated to reach all persons served; and (c) include the information required by 40 C.F.R. §§ 141.202–141.205 (as incorporated by Arizona law), including clear disclosure of the triggering result(s), the basis for the notice, and the required health-effects and precautionary instructions.

430.    In particular, a judicial declaration and permanent injunction requiring Defendant GW-Santa Cruz to (a) accurately, prominently, and completely disclose the water-quality test results and regulatory trigger(s) that give rise to the notice, (b) accurately, prominently, and completely warn the public of drinking water requiring boiling or disposal, and/or (c) include the information required by 40 C.F.R. §§ 141.202–141.205 (as incorporated by Arizona law), without omitting the categories of information reflected in ADEQ's Tier 1 template materials, would materially redress the ongoing risk of exposure and the need to incur out-of-pocket costs for bottled water, new filters, home testing kits and other related expenses, thereby redressing these continuing injuries while materially reducing public health risks, enhancing transparency, and restoring public confidence in the safety of the drinking-water system.

431.    Because Plaintiffs and the Exposure Subclass are presently forced to take extraordinary precautions and incur out-of-pocket costs solely due to uncertainty about Defendant GW-Santa Cruz's notice practices, upon entry of declaratory and injunctive relief, Plaintiffs and the Exposure Subclass reasonably expect that they will be able to rely on Defendant GW-Santa Cruz's public notices to determine when their tap water is

safe, will reduce or discontinue extraordinary precautionary measures such as purchasing bottled water and redundant filtration solely because of uncertainty about notification practices, and will thereby mitigate or avoid further out-of-pocket costs and anxiety attributable to the challenged conduct.

432.   Determining whether the public notice was false and misleading under the RTCR is a straightforward legal issue of the sort that courts typically resolve.

433.   Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a judicial declaration that Defendant GW-Santa Cruz's public notice for the August 2025 *E. coli* event was false and misleading.

434.   Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a judicial declaration that Defendant GW-Santa Cruz's public notice did not satisfy Tier 1 public notice requirements for content and accuracy.

435.   Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a permanent injunction ordering Defendant GW-Santa Cruz to include the information required by 40 C.F.R. §§ 141.202–141.205 (as incorporated by Arizona law), without omitting the categories of information reflected in ADEQ's Tier 1 template materials.

436.   Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a permanent injunction ordering Defendant to ensure that Tier 1 notices include the content required by 40 C.F.R. § 141.205 (as incorporated by Arizona law) and are not materially misleading by omission or undue reassurance.

437. Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a permanent injunction ordering Defendant GW-Santa Cruz to ensure that public notices, in addition to complying with the timeliness and delivery requirements of 40 C.F.R. § 141.202 and A.A.C. R18-4-119, accurately, prominently, and completely disclose the water-quality test results and regulatory trigger(s) that give rise to the notice, including any routine and repeat sample results relevant to the event.

438. Under the circumstances, Plaintiffs and the Exposure Subclass are entitled to a permanent injunction ordering Defendant GW-Santa Cruz to ensure that public notices, in addition to complying with the timeliness and delivery requirements of 40 C.F.R. § 141.202 and A.A.C. R18-4-119, accurately, prominently, and completely warn the public of drinking water requiring boiling or disposal.

439. Any injunctive relief should be narrowly tailored to require compliance with existing public notice and risk-communication duties under Arizona law (including ADEQ regulations incorporating the RTCR) and to prevent materially misleading communications, without regulating rates, tariffs, or technical system design and without displacing ACC/ADEQ oversight.

440. Successful prosecution of this declaratory and injunctive claim will confer a significant benefit on the public at large by improving the transparency, accuracy, and usefulness of drinking-water notices for all current and future customers of PWS 04-11-131, irrespective of whether they suffered illness or pursue individual damages.

///

97

## COUNT THREE

### *Operational Negligence*
(Negligence *Per Se*)
[Against all Defendants]

441.    Plaintiffs and the Illness Subclass incorporate all previous allegations as though specifically set forth herein.

442.    Defendant GW-Santa Cruz owed a duty of care to Plaintiffs and the Illness Subclass to ensure its potable water was free from poisonous, deleterious, filthy, foreign, or disease-causing substances.

443.    Defendant GW-Santa Cruz owed a duty of care to Plaintiffs and the Illness Subclass to properly test its potable water, as required by law, for poisonous, deleterious, filthy, foreign, or disease-causing substances.

444.    Defendant GW-Santa Cruz owed a duty of care to Plaintiffs and the Illness Subclass to notify them as soon as practical of any poisonous, deleterious, filthy, foreign, or disease-causing substances in its public potable water system.

445.    Defendant GW-Santa Cruz had a duty under the RTCR and corresponding Arizona regulations, A.A.C. R18-4-126 and R18-4-119, to collect and test repeat drinking-water samples that reasonably represented system conditions at the time any total-coliform-positive result was obtained.

446.    To the extent the Court concludes negligence *per se* doctrine does not apply on these facts, the same statutes and regulations are pleaded as admissible evidence of the applicable standard of care.

447. After receiving an *E. coli*-positive routine sample, Defendant GW-Santa Cruz increased chlorine residuals and flushed portions of its distribution system before collecting the required repeat samples. By altering the water conditions before retesting, Defendant GW-Santa Cruz rendered those repeat samples less reliably representative of the conditions that triggered the positive result.

448. This conduct substantially undermined the purpose of the repeat-sampling requirement—to confirm whether contamination persisted—and thereby breached Defendant GW-Santa Cruz's statutory and regulatory duty to collect valid, representative repeat samples.

449. Defendant GW-Santa Cruz breached its duties of care by supplying potable water that contained poisonous, deleterious, filthy, foreign, or disease-causing substances.

450. Defendant GW-Santa Cruz breached its duties of care by failing to adequately investigate and characterize the fecal contamination event, including failing to conduct repeat sampling and system assessments in a manner consistent with RTCR's public health purpose and basic industry practice; failing to adequately determine the nature, extent, and likely source of the fecal contamination within the distribution system; and by implementing remedial actions (including increased chlorination and flushing) in a way that foreseeably reduced the ability of follow-up testing to detect ongoing contamination and assess continuing risk.

451. Defendant GW-Santa Cruz breached its duties of care by failing to notify Plaintiffs and the Illness Subclass of any poisonous, deleterious, filthy, foreign, or

disease-causing substances in the potable water as soon as practical and/or in a manner reasonably calculated to immediately reach them, and failed to reasonably notify Plaintiffs and the Illness Subclass of the nature and seriousness of the public health risk.

452.   Defendant GW-Santa Cruz's breach of its duties of care constitutes negligence *per se* under Arizona law, as its actions violated statutory and regulatory provisions intended to protect the public from unsafe drinking water, including A.R.S. § 36-601(18), A.A.C. §§ R18-4-102, R18-4-105, R18-4-119, and R18-4-126(A).

453.   The contamination, exposure, and resulting public health hazard were the foreseeable and natural consequence of Defendant GW-Santa Cruz's failure to exercise reasonable care in operating and maintaining its public water system, including without limitation, its increasing chlorine levels and flushing before completing required repeat sampling, and then relying on those post-disinfection results to reassure the public, its delay in issuing an emergency public notice "as soon as practical," and its misleading public statements regarding the safety of the water.

454.   The injuries and risks sustained by Plaintiffs and the Illness Subclass were within the "class of harms" that the statutory and regulatory duties were designed to prevent and were the direct and foreseeable result of Defendant GW-Santa Cruz's breach of its duties of care.

455.   As a direct and proximate result of Defendant GW-Santa Cruz's acts and omissions—including, without limitation, its failure to properly monitor, sample, repeat sample and reasonably maintain its potable water distribution system, *E. coli* and other

fecal coliform bacteria entered, or persisted within, or otherwise rendered unsafe the drinking-water distribution system serving the Plaintiffs and the Illness Subclass.

456. As a direct and proximate result of Defendant GW-Santa Cruz's acts and omissions—including, without limitation, its failure to timely, reasonably, and accurately notify the Plaintiffs and Illness Subclass of the *E. coli* MCL violations and associated risks—Plaintiffs and the Illness Subclass continued to ingest, cook with, and otherwise use contaminated water without adequate warning, thereby increasing their exposure to *E. coli* and other fecal pathogens and the likelihood of illness.

457. As a direct and proximate result of Defendant GW-Santa Cruz's acts and omissions, Plaintiffs and the Illness Subclass were exposed to contaminated or unsafe drinking water, rendering the water unfit for its ordinary and intended purpose and creating a substantial and foreseeable risk of illness, gastrointestinal distress, and other health effects.

458. As a direct and proximate result of Defendant GW-Santa Cruz's acts and omissions, Plaintiffs and the Illness Subclass sustained compensable injuries, including but not limited to economic losses (including expenditures for bottled water, water filters, medical evaluation, treatment, hospitalization, and lost time), loss of use and enjoyment of their homes and community water supply, emotional distress, anxiety, and inconvenience arising from reasonable fear of exposure to contaminated drinking water.

459. Defendant GW-Santa Cruz's conduct was willful, wanton, and carried out with reckless disregard for the public's health and safety, warranting punitive damages.

460. Defendant GW-Santa Cruz acted with the requisite "evil mind" to justify punitive damages under Arizona law. Defendant GW-Santa Cruz knowingly failed to comply with mandatory water-safety and public-notification requirements, and with basic monitoring and risk-communication practices designed to prevent such harm.

461. Despite this knowledge, Defendant GW-Santa Cruz consciously disregarded the health and safety of Plaintiffs and the Illness Subclass by delaying mandatory public notification, misrepresenting the nature and extent of the contamination, and continuing to distribute water that it knew—or consciously disregarded the substantial probability—that it was unsafe.

462. This conduct reflects an evil hand guided by an evil mind because Defendant GW-Santa Cruz (a) was aware of the extreme risk of harm but deliberately chose not to act, and (b) intentionally misled the public to protect its own financial and operational interests. Plaintiffs and the Illness Subclass therefore seek punitive damages to punish and deter such reprehensible conduct.

463. Defendant GW-Santa Cruz is, and at all relevant times was, a wholly-owned subsidiary of Defendant GWRI.

464. Defendant GWRI exercises sufficient control over Defendant GW-Santa Cruz's operations to justify the imposition of derivative liability.

465. Defendant GWRI is the alter ego of Defendant GW-Santa Cruz.

466. Defendant GWRI is vicariously liable for GW-Santa Cruz's acts or omissions under well-established principles of agency, *respondeat superior*, or joint enterprise liability.

467. For purposes of the CAFA's local-controversy and home-state exceptions, Plaintiffs and the class allege that Defendant GWRI is not a "primary defendant." The core allegations in this Complaint concern the operation, maintenance, monitoring, testing, treatment, public notification, and delivery of potable water within the City of Maricopa—functions that are, by law and in practice, carried out by Defendant GW-Santa Cruz Water Company, the Arizona-citizen water utility that owns, operates, and controls the public water system at issue.

468. The CAFA's primary-defendant analysis turns on whether the defendant is the real target of the plaintiffs' claims—*i.e.*, the entity alleged to have committed the principal wrongs and from whom significant relief is sought.

469. Defendant GW-Santa Cruz is the entity legally responsible under Arizona law for the operation of the water system, for compliance with the Safe Drinking Water Act and its implementing regulations, and for issuing the mandatory Tier 1 public notices, resampling responses, and water-quality communications alleged herein.

470. Defendant GW-Santa Cruz, not Defendant GWRI, is the statutory "supplier," "operator," and "groundwater system" subject to ADEQ regulation.

471. To the extent Defendant GWRI is named, Plaintiffs allege its liability based on derivative theories of alter-ego, agency, instrumentality, ratification, and vicarious liability for the acts and omissions of Defendant GW-Santa Cruz.

472. Plaintiffs and the Illness Subclass do not allege that Defendant GWRI independently operated the water system, independently made water-quality decisions, or independently controlled the day-to-day technical or statutory compliance functions giving rise to the claims herein. Rather, Defendant GWRI's liability is alleged because it exercised relative control over its subsidiary and benefitted from its operations, not because it played the primary role in the underlying contamination event.

473. Plaintiffs and the Illness Subclass therefore allege that Defendant GWRI is not a primary defendant within the meaning of 28 U.S.C. § 1332(d)(4).

474. The sole primary defendant is Defendant GW-Santa Cruz, an Arizona corporation and Arizona citizen whose conduct forms the central focus of this litigation and whose actions and omissions constitute the principal basis for the relief sought.

### COUNT FOUR

### *Public Nuisance*
[Against all Defendants]

475. Plaintiffs and the Subclasses incorporate all previous allegations as though specifically set forth herein.

476. Defendant GW-Santa Cruz, as a public water utility, supplies potable water to thousands of residents within the City of Maricopa and owes a duty to operate,

maintain, and monitor its public water system in a manner that protects the public's health, safety, and comfort.

477.    During relevant times described herein, Defendant GW-Santa Cruz sold and provided Plaintiffs and the class with water that was impure, unwholesome, or dangerous to public health and described in A.R.S. § 36-601(A)(1) and (18).

478.    By failing to properly monitor, sample, and maintain its potable-water distribution system in compliance with Arizona law, Defendant GW-Santa Cruz allowed *E. coli* and other fecal pathogens to enter and persist within the drinking-water system.

479.    Defendant GW-Santa Cruz further aggravated this condition by prematurely elevating chlorine levels before completing required repeat sampling, delaying the issuance of a Tier 1 public notice "as soon as practical," failing to provide a proper public notice as alleged in Count One and Two, and publicly misrepresenting the safety of the water, thereby concealing the event and increasing the duration and extent of residents' exposure to contaminated water.

480.    Defendant GW-Santa Cruz's actions substantially interfered with the enjoyment of life and property in the affected community and neighborhood of a large number of persons.

481.    Defendant GW-Santa Cruz's acts and omissions created and maintained a condition that constituted a substantial and unreasonable interference with rights common to the general public under the circumstances, including the right to safe, sanitary, and healthful drinking water, and the right to security and comfort within one's community.

482. Defendant GW-Santa Cruz intentionally caused, created, or contributed to this event or condition and the event or condition was unreasonable under the circumstances.

483. This interference has affected a substantial number of residents within the City of Maricopa, jeopardizing public health, endangering the community's potable-water supply, and undermining confidence in the safety and reliability of public utilities.

484. As a direct and proximate result of Defendant GW-Santa Cruz's creation and maintenance of this public nuisance, Plaintiffs and the class suffered damages, including but not limited to the cost of being billed for unsafe water, obtaining alternative water supplies, loss of use and enjoyment of their homes, as well as fear, inconvenience, emotional distress, discomfort, and annoyance.

485. Plaintiffs bring this public nuisance claim on behalf of both proposed subclasses, but monetary relief under this Count is sought solely on behalf of the Illness Subclass. The Exposure Subclass seeks under this Count only declaratory and injunctive relief to abate the nuisance and to prevent recurrence, together with taxable costs recoverable under applicable court rules (and, if applicable, statutory attorneys' fees), and does not seek compensatory damages for personal injury, emotional distress, anxiety, fear, discomfort, annoyance, loss of enjoyment, or other individualized money damages.

486. The conduct of Defendant GW-Santa Cruz was willful, wanton, and in reckless disregard of the health and safety of the public. Plaintiffs and the Subclasses are therefore entitled to recovery of damages and to the abatement of the nuisance.

487.    Defendant GW-Santa Cruz's conduct was intentional, willful, and carried out with an evil mind and a conscious disregard for the public's health and safety, thereby warranting an award of punitive and exemplary damages under Arizona law.

488.    Defendant GW-Santa Cruz acted with the requisite "evil mind" to justify punitive damages under Arizona law. Defendant GW-Santa Cruz knew that the presence of *E. coli* in a public water system poses a substantial likelihood of serious illness and knowingly failed to comply with mandatory water-safety and public-notification requirements, and with basic monitoring and risk-communication practices designed to prevent such harm.

489.    Despite this knowledge, Defendant GW-Santa Cruz consciously disregarded the health and safety of Plaintiffs and the Subclasses by delaying mandatory Tier 1 public notification, misrepresenting the nature and extent of the contamination, and continuing to distribute water that they knew—or consciously disregarded the substantial probability—that it was unsafe.

490.    This conduct reflects an evil hand guided by an evil mind because Defendant GW-Santa Cruz (a) was aware of the extreme risk of harm but deliberately chose not to act, and (b) intentionally misled the public to protect its own financial and operational interests. Plaintiffs and the Subclasses therefore seek punitive damages to punish and deter such reprehensible conduct.

491.    Plaintiffs and the Subclasses seek injunctive relief requiring Defendant GW-Santa Cruz to abate the nuisance by enforcing nondiscretionary Tier 1 public-notice

duties and prohibiting misleading water-safety communications, including by maintaining written emergency notice procedures and using delivery methods reasonably calculated to reach all persons served—without asking the Court to set rates, dictate engineering design, or displace ADEQ/ACC oversight.

492. Defendant GW-Santa Cruz is, and at all relevant times was, a wholly-owned subsidiary of Defendant GWRI.

493. Defendant GWRI exercises sufficient control over Defendant GW-Santa Cruz's operations to justify the imposition of derivative liability.

494. Defendant GWRI is the alter ego of Defendant GW-Santa Cruz.

495. Defendant GWRI is vicariously liable for GW-Santa Cruz's acts or omissions under well-established principles of agency, *respondeat superior*, or joint enterprise liability.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants GW-Santa Cruz and GWRI as follows:

A.    Certify this action as a class action pursuant to Rule 23, including certification of a Rule 23(b)(2) Exposure Subclass for declaratory and injunctive relief against Defendant GW-Santa Cruz and a Rule 23(b)(3) Illness Subclass for compensatory and other damages against Defendants GW-Santa Cruz and, to the extent proven, vicarious/alter ego liability

against Defendants GWRI; appoint Plaintiffs as Class Representatives and appoint their counsel as Class Counsel;

B.    Declare that, in connection with the August 2025 *E. coli* contamination event, Defendant GW-Santa Cruz failed to provide timely, adequate, and effective Tier 1 public notice and warnings as required by Arizona law and ADEQ regulations incorporating the RTCR;

C.    Declare that Defendant GW-Santa Cruz's public statements, Tier 1 public notice(s), and related communications concerning the August 2025 contamination event were false, misleading, incomplete, or otherwise inadequate under Arizona law, including A.A.C. R18-4-119 and ADEQ regulations incorporating the RTCR;

D.    Enjoin Defendant GW-Santa Cruz from issuing false, misleading, incomplete, or confusing public notices or communications regarding the safety or quality of drinking water provided to consumers, including future Tier 1 notices as incorporated by Arizona law;

E.    Enjoin GW-Santa Cruz from delaying Tier 1 notices beyond the timeframe required by 40 C.F.R. § 141.202(a) and A.A.C. R18-4-119, namely "as soon as practical" (and no later than 24 hours) after learning of a Tier 1 trigger;

F.    Enjoin Defendant GW-Santa Cruz, after any *E. coli* detection or MCL violation, upon any Tier 1 trigger event, to provide public notice using one or more delivery methods (individually or in combination) that are

reasonably calculated to reach all persons served, including customers who may not receive email notices, and including sensitive populations and community facilities;

G.    Enjoin Defendant GW-Santa Cruz to maintain written Tier 1 notice procedures ensuring compliance with the timeliness, delivery, and content requirements of 40 C.F.R. §§ 141.202–141.205 and A.A.C. R18-4-119, leaving the manner of implementation to Defendants subject to existing ADEQ/ACC oversight;

H.    Enjoin Defendant GW-Santa Cruz, after any *E. coli* detection or MCL violation, to ensure that public notices, in addition to complying with the timeliness and delivery requirements of 40 C.F.R. § 141.202 and A.A.C. R18-4-119, accurately, prominently, and completely disclose the water-quality test results and regulatory trigger(s) that give rise to the notice, including any routine and repeat sample results relevant to the event;

I.    Enjoin Defendant GW-Santa Cruz, after any *E. coli* detection or MCL violation, to ensure that public notices, in addition to complying with the timeliness and delivery requirements of 40 C.F.R. § 141.202 and A.A.C. R18-4-119, accurately, prominently, and completely warn the public of drinking water requiring boiling or disposal;

J.    Award compensatory damages to members of the Illness Subclass in an amount to be determined at trial;

K.    Award punitive damages to the Illness Subclass as permitted by Arizona law;

L.    Award pre- and post-judgment interest as provided by law;

M.    An award of reasonable attorneys' fees as permitted by law, including, where applicable, Rule 23(h), the common-fund doctrine, and, where otherwise permitted under Arizona law, the private attorney general doctrine;

N.    Award reasonable costs incurred; and

O.    Award such other and further relief as the Court deems just and proper.

**DATED** this 29th of December, 2025.

**FRIEDL RICHARDSON, P.C.**

/s/ Geoffrey M. Trachtenberg
Geoffrey M. Trachtenberg, Esq.
*Attorney for the Plaintiffs*

111

# EXHIBIT A



EXHIBIT B



Dear ███████████

At Global Water, public health and safety is our top priority, and we have an exceptional compliance record of which we can be proud.

**_We're sending this email to make you aware of a situation that was recently resolved._**

During recent routine monitoring, which consisted of dozens of samples from August 26th through August 28th, we received notification from our 3rd party laboratory that a water sample did not meet regulatory requirements. This sample result requires us to issue a Tier 1 Advisory to customers served within a specific area of our regional system that received the positive test result.

To address the issue, chlorination was increased and the system was flushed in the area of the positive test.

Repeat samples were taken and **all** samples collected are now testing negative.

**This event is considered resolved by the Arizona Department of Environmental Quality.**

Please visit our dedicated web page at https://www.gwresources.com/update to read the Advisory and learn more.

Thank you for being a valued Global Water Customer.

Global Water Resources

EXHIBIT C

**DRINKING WATER NOTICE**

**IMPORTANT INFORMATION ABOUT YOUR DRINKING WATER**

**System AZ040[＿＿＿＿＿] Well # 55-[＿＿＿＿＿＿] Tested Positive for Fecal Contamination**

**DO NOT DRINK THE WATER WITHOUT BOILING IT FIRST**

---

**Aviso: No tome el agua sin antes hervirla**

*Este informe contiene información importante acerca de su agua potable. Haga que alguien lo traduzca para usted, o hable con alguien que lo entienda.*

---

Our water system detected fecal indicators (E. coli) in our Ground Water Well. As our customers, you have a right to know what happened and what we are doing to correct this situation. On [notification date of routine positive sample] we learned that one of our routine samples collected [sample date of routine positive sample] was total coliform positive. As required by EPA's Ground Water Rule, one of our follow-up steps was to collect samples from our wells. The sample from our Ground Water Well collected on [RAW water sample date] tested positive for a fecal indicator (E. coli). We are now conducting additional sampling of the well to determine the extent of the problem and are conducting a thorough investigation to determine the source of the contamination.

Inadequately treated or inadequately protected water may contain disease-causing organisms. Fecal indicators are microbes whose presence indicates that the water may be contaminated with human or animal wastes. Microbes in these wastes can cause short-term health effects, such as diarrhea, cramps, nausea, headaches, or other symptoms. They may pose a special health risk for infants, young children, the elderly, and people with compromised immune systems. These symptoms are not only caused by organisms in drinking water. If you experience any of these symptoms and they persist, you may want to seek medical advice.

**What should I do?**
**DO NOT DRINK THE WATER WITHOUT BOILING IT FIRST**. Bring all water to a rolling boil for one minute per 1000 ft. elevation, and let it cool before using. Boiling kills bacteria and other organisms in the water. You may also use bottled water. Use boiled or bottled water for drinking, making ice, preparing food, brushing teeth, and washing dishes until further notice.

Also, if you have a compromised immune system, have an infant, or are elderly, you may be at increased risk and should seek advice about drinking water from your health care providers. General guidelines on ways to lessen the risk of infection by microbes are available from EPA's Safe Drinking Water Hotline at (800) 426-4791. If you have specific health concerns, consult your doctor.

**What is being done?**
[Describe corrective action.] We will inform you when tests show no bacteria and you no longer need to boil your water. We anticipate resolving the problem within [estimated time frame].

**When is the system expected to return to compliance?**
We anticipate resolving this problem in the short term by providing/asking our customers to use bottled water for drinking, cooking, and washing. We will be disinfecting and flushing the Well to take confirmations samples to see if this situation persists. To resolve this issue long term we will be looking into the different corrective actions set forth by the Ground Water Rule and working with the Arizona Department of Environmental Quality (ADEQ).

pn_tier1_gwr_boil.doc                          Page 1 of 2

For more information, please contact [contact person and phone number].

*Please share this information with other people who drink this water, especially those who may not have received this notice directly (for example, people in apartments, nursing homes, schools, and businesses). You can do this by posting this notice in a public place or distributing copies by hand or mail.*

This notice is being sent to you by [Public Water System Name]
Water System ID#: AZ04[_ _ _ _ _]
Date distributed: [_ _ / _ _ / _ _ _ _]

# EXHIBIT D

The Wayback Machine - https://web.archive.org/web/20250830202324/https://www.gwresources.com/public-notice


# Public Notice

August 30, 2025

### Global Water - Santa Cruz Water Company, Inc. Customer Notice

At Global Water, public health and safety is our top priority and we have an exceptional compliance record that we are very proud of. Part of ensuring public health and safety is remaining in compliance with all safe drinking water regulations. To ensure this, we take nearly 1,000 water quality samples annually from our public water system in the City of Maricopa.

During recent routine monitoring, which consisted of dozens of samples from August 26th through August 28th, we received notification from our 3rd party laboratory that a water sample did not meet regulatory requirements. This sample result requires us to issue the attached Tier 1 Advisory to customers served within a specific area of our regional system that received the positive test result. Please read the advisory that addresses the matter. The matter is FULLY RESOLVED.

In addition to the notice, we wanted to provide additional information for transparency and clarification.

- On August 27th, Global Water received sample results from testing on August 26th. At one sample location, the result indicated the presence of E. Coli bacteria.
- In response, we took proactive steps to ensure system compliance including activities such as flushing and supplemental disinfection.
- Subsequently, following regulatory protocol, additional samples were taken on August 28th. The results received on August 29th came back absent for E. Coli, thus the event is resolved.
- Bacterial contamination can occur after increased run-off occurs following periods of heavy rain or dust storms, or a failure in water treatment process.
- It is important to note that there is no evidence of any system or operational failure, as all water systems performed as designed through the recent storm events, and we continuously disinfected all potable water in accordance with state and federal requirements, maintaining safe disinfection residuals throughout the system.
- Throughout the event we have been in communications with the Arizona Department of Environmental Quality ("ADEQ") and kept them informed of the situation. ADEQ regulates Global Water's utilities in Pinal County, enforcing stringent requirements to ensure all drinking water meets safe drinking water standards.
- We have also reached out to the Arizona Corporation Commission, as well as the City of Maricopa to advise them of the event.

We will continue to monitor and ensure all samples continue to meet all regulatory requirements, a track record we have demonstrated with over 20 years of safe, reliable service in Maricopa.
For more information, including a map that shows the specific area of effected customers, please visit our website at https://www.gwresources.com/update.
For more detail questions, customers can email customerservice@gwresources.com.

---

**IMPORTANT INFORMATION ABOUT YOUR DRINKING WATER**

**For Global Water - Santa Cruz Water Company, Inc. PWS AZ 04-11-131**

**Bacteriological (E.coli) Advisory in Your Drinking Water**

The Global Water - Santa Cruz Water Company, Inc. PWS AZ 04-11-131 is issuing this notice to inform our customers that E.coli bacteria was found at one location of the water system on the 26th of August 2025. As our customers, you have a right to know what happened and the actions we took to resolve the issue. These bacteria can make you sick and are a particular concern for people with weakened immune systems.

Bacteriological contamination can occur when increased run-off enters the drinking water supply (for example, following heavy rains and dust storms). It can also happen due to a break in the distribution system (pipes) or a failure in the water treatment system.

**What Happened?**
On the 26th of August 2025, 13 routine samples were collected for bacteriological testing. On the 27th of August 2025, we learned one of those samples was E.coli positive. Chlorination of the system was increased

and flushing the system was conducted in the area of the positive test. As required by the Arizona Department of Environmental Quality ("ADEQ"), repeat samples were taken within 24 hours on the 28th of August 2025. We conducted a 1st set of repeat sampling in the morning and a 2nd set of repeat sampling in the afternoon at the original location of the E.coli positive and at locations upstream and downstream while continuing to flush the system. On the 29th of August 2025, we received notice that all samples collected on the 29th of August 2025 were E.coli negative.

What should I do? What does this mean?
GIVEN THE QUICK ACTIONS TAKEN, THIS EVENT IS CONSIDERED RESOLVED BY ADEQ. Your water is safe to drink. Customers are advised to discard or boil any water collected prior to August 29, 2025. Examples of collected water would be carboys, water pitchers, etc. Customers are also advised to flush stagnant faucets through their household. If you choose to boil your water, bring all water to a rolling boil for a minimum of three minutes, and let it cool before using. Boiling kills bacteria and other organisms in the water. You may also use bottled water.

*Fecal coliforms and E. coli are bacteria whose presence indicates that the water may be contaminated with human or animal wastes. Microbes in these wastes can cause diarrhea, cramps, nausea, headaches, or other symptoms. They may pose a special health risk for infants, young children, and people with severely compromised immune systems.*

The symptoms above are not caused only by organisms in drinking water. If you experience any of these symptoms and they persist, you may want to seek medical advice. People at increased risk should seek advice from their health care providers about drinking this water.

Also, if you have a compromised immune system, have an infant, or are elderly, you may be at increased risk and should seek advice about drinking water from your health care providers. General guidelines on ways to lessen the risk of infection by microbes are available from EPA's Safe Drinking Water Hotline at (800) 426-4791. If you have specific health concerns, consult your doctor.

What is being done?
We have been in communication with ADEQ and kept them informed during this event and as indicated above, this event is considered resolved by ADEQ. An investigation of the system revealed there was NO evidence of a system failure or operational failure and chlorine levels continue to be maintained at safe levels for disinfection. We will continue to take routine samples for bacteriological testing, and we will inform you if there is any additional issues that may arise.

For more information, please contact Customer Service at 866-940-1102 or customerservice@gwresources.com. General guidelines on ways to lessen the risk of infection by microbes are available from the EPA Safe Drinking Water Hotline at 1-800-426-4791.

*Please share this information with all the other people who drink this water, especially those who may not have received this notice directly (for example, people in apartments, nursing homes, schools, and businesses). You can do this by posting this notice in a public place or distributing copies by hand or mail.*

This notice is being sent to you by Global Water - Santa Cruz Water Company, Inc. State Water System ID#: AZ04-11-131

Date distributed: 30 August 2025



**COMPANY**

LEADERSHIP

COMPANY PROFILE

FAMILY OF COMPANIES

CAREERS

**DEVELOPER RESOURCES**

METER APPLICATIONS

**INVESTOR RESOURCES**

BOARD OF DIRECTORS

SEC FILINGS

**CUSTOMER RESOURCES**

LOG IN

NEW CUSTOMERS

SERVICE INQUIRIES

RATES AND TARIFFS

FREQUENTLY ASKED QUESTIONS

RATE CASE

UNDERSTANDING YOUR BILL

CONSERVATION & EDUCATION

CONTACT US

Global Water Resources, Inc. is a water resource management company. We provide water, wastewater, and recycled water utility services.

Privacy Policy

Forward-Looking Statements

Terms of Use

© 2003 –2025 by Global Water Resources, Inc.